[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10288

Non-Argument Calendar
_____

Agency No. 26552-10


PHILIP LONG,

Petitioner-Appellant,

versus

COMMISSIONER OF IRS,

Respondent-Appellee.


_____

Petition for Review of a Decision of the
United States Tax Court
_____

(November 20, 2014)

Before TJOFLAT, WILSON, and JORDAN, Circuit Judges.

PER CURIAM:

Philip Long appeals the United States Tax Court's final order and decision on his petition for redetermination of deficiency brought under 26 U.S.C. § 6213(a). Long argues that the Tax Court erred by concluding that the $5.75 million Long received from the assignment of his position as plaintiff in a lawsuit constituted taxable ordinary income, rather than long term capital gains. Long also argues that the Tax Court erred by concluding that Long's $600,000 payment to Steelervest, Inc. (Steelervest) did not qualify as a deductible expense. Long further argues that the Tax Court erred by concluding that Long presented insufficient evidence of unaccounted legal fees.

I.

In October 2007, Long filed a federal income tax return for 2006, reporting a taxable income of $0. In September 2010, the Internal Revenue Service (IRS) served Long with a notice of deficiency, which indicated that Long had a taxable income of $4,145,423 and had incurred $1,430,743 of tax liability in 2006. Long filed a pro se petition in the Tax Court seeking a redetermination of his deficiency on the grounds that he properly reported his taxable income and that the IRS made several errors in calculating his cost of goods and gross receipts. The IRS's answer denied any error in the notice of deficiency.

In October 2011, Long and the IRS executed a stipulation of facts and exhibits, as required by the Tax Court, which the IRS supplemented three times

2

thereafter.  According to the stipulated facts, from 1994 to 2006, Long, as sole proprietor, owned and operated Las Olas Tower Company, Inc. (LOTC), which was created to design and build a luxury high-rise condominium called the Las Olas Tower on property owned by the Las Olas Riverside Hotel (LORH).  LOTC never filed any corporate income tax returns and did not have a valid employer identification number.  Instead, Long reported LOTC's income on his Schedule C of his individual tax return.

From 1997 to 2003, Long also owned Alhambra Brothers, Inc. (Alhambra), which was created to build a different luxury condominium in Ft. Lauderdale, Florida.  To facilitate the building of the condominium, Alhambra formed Alhambra Joint Ventures (AJV) with Steelervest, a company owned by Henry J. Langsenkamp, III.

In 1995, Steelervest entered into a contract to loan funds to LOTC for the development of Las Olas Tower.  In November 2001, Steelervest purchased Long's interest in AJV, and, as part of the deal (the AJV Agreement), Steelervest agreed to forgive the loans previously issued to LOTC.  As part of the same deal, Long agreed to pay Steelervest $600,000 in the event that Long sold his interest in the Las Olas Tower project, or twenty percent of the net profit resulting from the development of the Law Olas Tower project.

3

In 2002, Long, negotiating on behalf of LOTC, entered into an agreement with LORH (the Riverside Agreement) whereby LOTC agreed to buy land owned by LORH for $8,282,800, with a set closing date of December 31, 2004. LORH subsequently terminated the contract unilaterally and, on March 26, 2004, LOTC filed suit in Florida state court against LORH for specific performance of the contract and other damages. LOTC won at trial, and on November 21, 2005, the state court entered judgment in favor of LOTC, and ordered LORH to honor the Riverside Agreement and proceed with the sale of the land to LOTC within 326 days from the date of entry of the final judgment. LORH appealed the judgment.

In August 2006, during the appeals process for the Riverside Agreement litigation, Steelervest and Long renegotiated the terms of the AJV Agreement, and, in a new agreement (the Amended AJV Agreement), Long agreed to pay Steelervest fifty percent of the first $1.75 million, up to a maximum of $875,000, of monies received by Long as a result of the Riverside Agreement litigation. On September 13, 2006, Long entered into an agreement with Louis Ferris, Jr. (the Assignment Agreement), whereby Long sold his position as plaintiff in the Riverside Agreement lawsuit to Ferris for $5,750,000. While the Amended AJV Agreement arguably entitled Steelervest to $875,000, Steelervest agreed to receive $600,000 and release all rights to pursue collection under the Amended AJV Agreement.

4

At the April 11, 2012 Tax Court trial, Long began his testimony by arguing that the $600,000 payment to Steelervest was a deductible business expense, not a non-deductible loan repayment. Long insisted that the $600,000 paid to Steelervest could not have been a debt repayment, because all debts were extinguished by the AJV Agreement.

Long also testified that he began the Las Olas Tower project in 1995 when he had the idea to build a luxury condominium in a prime real estate market. Long claimed he intended to coordinate the development of the Las Olas Tower project, and sought funding from his business partner and friend, Langsenkamp. Long explained that he spent thirteen years working on the Las Olas Tower project, and, in the end, he was able to sell his right to build the project.

Next, Long proffered a letter from his attorneys as evidence of $238,343.71 in unaccounted legal fees, but the Tax Court refused to admit the letter as inadmissible hearsay. The Tax Court then afforded Long the opportunity to continue the trial so that Long could find the appropriate documentation regarding his legal fees and present witnesses to properly authenticate those documents. Long stated, however, that he was going to "give up" and "concede" the issue of unreported legal fees because he had no way of getting admissible evidence before the Tax Court in a timely fashion.

5

On cross-examination, Long testified that he was the developer of the Las Olas Tower project, and his role was to design the property with an architect, obtain local government approval for the project, and merchandise the property. Long provided promotional material to potential clients, worked with clients to execute contracts, and received deposits for approximately twenty percent of Las Olas Tower's sixty to ninety proposed condominium units. Long worked full-time as the developer for the project.

After Long's testimony, the IRS called John McCrory, Steelervest's and Langsenkamp's attorney, who testified that AJV and the Ft. Lauderdale condominium project were losing enterprises, and Langsenkamp's only hope of making money was to have the loans Steelervest gave to LOTC repaid out of profits from the Las Olas Tower project. The purpose of the AJV Agreement was to cancel the notes issued to LOTC, and transfer Long's indebtedness to profits from the Las Olas Tower project. Essentially, the $600,000 was a substituted obligation for the cancelled promissory notes.

At the end of the trial, Long stated that his sole objection to the IRS's calculation of his 2006 tax liability was that his $600,000 payment to Steelervest was a deductible business expense, not a loan repayment. Long also reiterated that he agreed to give up on the additional legal fees. The IRS then noted its objection to Long's characterization of his 2006 income as capital gains.

6

Long stated in his post-trial brief that he should not have withdrawn his claim regarding unaccounted legal fees, and argued that the IRS improperly omitted $238,544 of deductible legal expenses from his 2006 tax return. Additionally, the $600,000 payment to Steelervest did not constitute a loan repayment because the controlling documents indicated that the AJV Agreement eliminated all of Long's debt. Long also asserted that his income from the Assignment Agreement constituted the sale of an asset, and, therefore, his tax return should be completed using the long term capital gains method.

The IRS stated in its post-trial brief that the $600,000 payment to Steelervest must have been a debt repayment because Steelervest was not a participant in a joint venture with LOTC. The IRS also argued that the $5,750,000 received by Long from the Assignment Agreement constituted ordinary income, not capital gains. Specifically, Long received $5,750,000 in lieu of future ordinary income payments, and, therefore, that money should be counted as ordinary income under the "substitution for ordinary income doctrine." *See Comm'r v. P.G. Lake, Inc.*, 356 U.S. 260, 260 S. Ct. 691 (1958). Additionally, Long was not entitled to an increased legal fee deduction because, at trial, he presented no evidence demonstrating his entitlement to an increased deduction, and, regardless, he affirmatively abandoned the issue.

7

The Tax Court rejected Long's arguments and found him liable for a tax deficiency of $1,430,743.  First, the Tax Court determined that Long's concession regarding the deductibility of additional legal fees amounted to a binding stipulation that he was not entitled to an increased deduction.  Moreover, even if Long had not conceded the issue, he did not present sufficient evidence at trial demonstrating his entitlement to an enhanced legal fee deduction.  Second, based on factors enumerated in previous published Tax Court decisions, the Tax Court concluded that the AJV Agreement did not create a joint venture between Steelervest and LOTC, and, therefore, the entire $5.75 million payment Long received for his postion in the Riverside Agreement litigation constituted non-deductible, taxable income attributable to Long, including the $600,000 that Long subsequently paid to Steelervest.  Finally, the Tax Court, treating LORH's land as the putative capital asset, found that Long intended to sell the land to a developer and concluded that the applicability of the capital gains statute "depend[ed] on whether Long intended to sell the land to customers in the ordinary course of his business."  The Tax Court determined that, while Long only intended to sell the land for the Las Olas Tower project, and not the individual condominium units themselves, the $5.75 million payment for Long's position in the lawsuit nevertheless constituted ordinary income because Long intended to sell the land to customers in the ordinary course of his business.

8

## II.

We review decisions of the Tax Court "in the same manner and to the same extent as decisions of the district courts in civil actions tried without a jury." 26 U.S.C. § 7482(a)(1). We review the Tax Court's legal conclusions and interpretations of the tax code de novo and its findings of facts for clear error. *Ocmulgee Fields, Inc. v. Comm'r*, 613 F.3d 1360, 1364 (11th Cir. 2010). Additionally, we may affirm on any ground that finds support in the record. *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007) (per curiam).

## III.

Long argues that the $5.75 million he received from the Assignment Agreement should be assessed as a long term capital gain rather than as ordinary taxable income. Long notes that he only had an option to purchase LORH's land and the only asset he ever had in the Las Olas Tower project was the Riverside Agreement.

In response, the IRS argues that Long's proceeds from the Assignment Agreement were not a capital gain, but rather a lump sum substitution for the ordinary income he would have earned from developing the Las Olas Tower project. Thus, under the "substitute for ordinary income doctrine," the $5.75 million lump sum payment was taxable as ordinary income. Additionally, in light

9

of this analysis, the Tax Court's discussion of factors to determine Long's primary purpose for holding the property was irrelevant. The IRS also argues that the $5.75 million, which constitutes Long's proceeds from the sale of his judgment, is a short-term gain, because Long sold the judgment to Ferris on September 13, 2006, less than a year after the court entered judgment on November 21, 2005.

Long did not file a reply brief.

## IV.

Income representing proceeds from the sale or exchange of a capital asset that a taxpayer holds for over a year is considered a capital gain and is taxed at a favorable rate. *Womack v. Comm'r*, 510 F.3d 1295, 1298 (11th Cir. 2007). Other income, or "ordinary income," is taxed at a higher rate. *Id.* "[T]he term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include . . . stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." 26 U.S.C. § 1221(a)(1). In certain circumstances, contract rights may be capital assets. *See Pounds v. United States*, 372 F.2d 342, 346 (5th Cir. 1967).

This Court has observed that "the statutory definition of 'capital asset' has never been read as broadly as the statutory language might seem to permit, because

such a reading would encompass some things Congress did not intend to be taxed as capital gains." *Womack*, 510 F.3d at 1299 (second alteration in original) (internal quotation marks omitted). "[T]he term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time. *Id.*

The Tax Court erred by misconstruing the "property" subject to capital gains analysis under § 1221. The Tax Court analyzed the capital gains issue as if the land subject to the Riverside Agreement was the "property" that Long disposed of for in return for $5.75 million. The record makes clear, however, that Long never actually owned the land, and, instead, sold a judgment giving the exclusive right to purchase LORH's land pursuant to the terms of the Riverside Agreement. In other words, Long did not sell the land itself, but rather his right to purchase the land, which is a distinct contractual right that may be a capital asset. *See Pounds*, 372 F.2d at 346. The Tax Court erred by ignoring this distinction.

This distinction is material because the "property" subject to the capital gains analysis was really Long's exclusive right to purchase the property pursuant to the Florida court judgment. The dispositive inquiry is not "whether Long intended to sell the land to customers in the ordinary course of his business," but whether Long held the exclusive right to purchase the property "primarily for sale

11

to customers in the ordinary course of his trade or business." *See* 1221(a)(1). There is no evidence that Long entered into the Riverside Agreement with the intent to assign his contractual rights in the ordinary course of business, nor is there evidence that, in the ordinary course of his business, Long obtained the Florida court judgment for the purpose of assigning his position as plaintiff to a third party. Rather, the record makes clear that Long always intended to fulfill the terms of the Riverside Agreement and develop the Las Olas Tower project himself.

The IRS asserts two alternate grounds for affirming the Tax Court's decision. First, the IRS incorrectly asserts that Long's proceeds from the Assignment Agreement constitute short-term capital gains. If the asset subject to capital gains treatment was an assignment of litigation rights, then Long acquired the asset when he filed suit in March of 2004, not when he obtained the judgment. Additionally, the real asset at issue was Long's exclusive right to purchase the land, which he obtained pursuant to his execution of the Riverside Agreement in 2002, well over the one-year period required for long-term capital gains treatment. *See Womack*, 510 F.3d at 1298.

Second, the IRS argues that Long's proceeds from the Assignment Agreement were a lump sum substitute for his future ordinary income, and under the "substitute for ordinary income doctrine" the proceeds should be characterized as ordinary income. We cannot agree.

12

"[T]he substitute for ordinary income doctrine is the only recognized judicial limit to the broad terms of [§] 1221." *Tempel v. Comm'r*, 136 T.C. 341, 347 (2011) *aff'd sub nom. Esgar Corp. v. Comm'r.*, 744 F.3d 648 (10th Cir. 2014). Therefore, "when determining whether property is a capital asset under [§] 1221, unless one of the eight exceptions or the substitute for ordinary income doctrine applies it is a capital asset." *Id.*

The substitute for ordinary income doctrine provides that when a party receives a lump sum payment that "essentially [is] a substitute for what would otherwise be received at a future time as ordinary income that lump sum payment is taxable as ordinary income as well." *Womack*, 510 F.3d at 1299 (internal quotation marks omitted). The overall effect of the doctrine "has been to narrow what a mechanical application of [§] 1221 would otherwise cause to be treated as a capital asset." *Id.* at 1300.

In determining whether a lump sum payment serves as a substitute for ordinary income, we look to "the type and nature of the underlying right or property assigned or transferred." *United States v. Woolsey*, 326 F.2d 287, 291 (5th Cir. 1963).[1] A lump sum payment for a fixed amount of future earned income is taxed as ordinary income. *See, e.g.*, *Hort v. Comm'r*, 313 U.S. 28, 30, 61 S. Ct.

---

[1] The Eleventh Circuit, sitting en banc, adopted as binding precedent all decisions rendered by the Fifth Circuit prior to close of business on October 1, 1981. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

757, 757–58 (1941) (building owner's receipt of lump sum payment in exchange for cancelling a lease on his property constitutes ordinary income); *Womack*, 510 F.3d at 1301 (lottery winner's receipt of lump sum payment in exchange for right to future lottery winning disbursements constitutes ordinary income).

It cannot be said that the profit Long received from selling the right to *attempt* to finish developing a large residential project that was far from complete was a substitute for what he would have received had he completed the project himself. Long did not have a future right to income that he already earned. By selling his position in the litigation, Long effectively sold Ferris his right to finish the project and earn the income that Long had hoped to earn when he started the project years prior. Taxing the sale of a right to create—and thereby profit—at the highest rate would discourage many transfers of property that are beneficial to economic development.

Long possessed a "bundle of rights [that] reflected something more than an opportunity…to obtain periodic receipts of income." *Comm'r v. Ferrer,* 304 F.2d 125, 130–31 (2d Cir.1962) (internal quotation marks omitted). Long's profit was not "simply the amount [he] would have received eventually, discounted to present value." *Womack*, 510 F.3d at 1301. Rather, Long's rights in the LORH property represented the potential to earn income in the future based on the owner's actions in using it, not entitlement to the income *merely by owning the property*. *See id.* at

14

1302. We have already held that selling a right to *earn* future undetermined income, as opposed to selling a right to *earned* income, is a critical feature of a capital asset. *United States v. Dresser Indus., Inc*., 324 F.2d 56, 59 (5th Cir. 1963). The fact that the income earned from developing the project would otherwise be considered ordinary income is immaterial. *Id*.

We hold that the profit from the $5.75 million Long received in the sale of his position in the Riverside Agreement lawsuit is more appropriately characterized as capital gains. The ruling of the Tax Court is reversed and remanded with instructions to determine Long's new tax liability in accordance with this opinion.

V.

Long next argues that the Tax Court erred by not treating his $600,000 payment to Steelervest as a deductible "reduction of income." Specifically, Long contends the $600,000 was not a non-deductible loan repayment, but rather a payment due as part of a stipulated profit participation agreement and, therefore, was a "reduction of income and a deductible expense."

In response, the IRS argues that the AJV Agreement and Amended AJV Agreement are debt instruments, and, as such, the $600,000 payment to Steelervest constituted a non-deductible payment of indebtedness. Moreover, the IRS argues that regardless of the characterization of the AJV Agreements, Long conceded that

15

all of LOTC's income flowed through him, and Long failed to identify any provision of the tax code entitling him to deduct the $600,000.

"When a taxpayer receives a loan, he incurs an obligation to repay that loan at some future date." *Comm'r v. Tufts*, 461 U.S. 300, 307, 103 S. Ct. 1826, 1831 (1983). "Because of this obligation, the loan proceeds do not qualify as income to the taxpayer." *Id.* "When [the taxpayer] fulfills the obligation, the repayment of the loan likewise has no effect on his tax liability. *Id.*

Additionally, "deductions under the Internal Revenue Code are a matter of legislative grace and the taxpayer who claims the benefit must bear the burden of proof that he is entitled to the particular deduction.' *O'Neal v. United States*, 258 F.3d 1265, 1276 (11th Cir. 2001). As such, the taxpayer "must 'clearly establish' his entitlement to a particular deduction." *Anselmo v. Comm'r*, 757 F.2d 1208, 1211 n.2 (11th Cir. 1985).

Throughout the proceedings in the Tax Court, Long never made clear whether his argument was that (1) the $600,000 paid to Steelervest was its profit share of a joint venture with LOTC (meaning, of the $5.75 million Long received from the Assignment Agreement, only $5.15 million was his actual income), or (2) the entirety of the $5.75 million was Long's income, but the $600,000 paid to Steelervest qualified as a deductible expense. Long concedes in his opening brief that he did not participate in a joint venture with Steelervest, and, therefore, the

16

entirety of the $5.75 million in proceeds from the Assignment Agreement was attributable to Long's income. Accordingly, the issue on appeal is whether the $600,000 Long paid to Steelervest qualified as a deductible expense.

Here, the Tax Court committed no error because Long did not meet his burden of clearly establishing his entitlement to deduct the $600,000 paid to Steelervest. *See O'Neal*, 258 F.3d at 1276; *Anselmo*, 757 F.2d at 1211 n.2. The record demonstrates that the nature and character of the Amended AJV Agreement was to renegotiate Long's repayment terms with respect to his indebtedness to Steelervest. Accordingly, the $600,000 was a loan repayment that does not qualify as a deductible expense. *See Tufts*, 461 U.S. at 307, 103 S. Ct. at 1831. Moreover, regardless of the characterization of the Amended AJV Agreement, Long provides no statutory support for his contention that LOTC's alleged "profit participation" with Steelervest constitutes a deductible expense. Accordingly, Long has not met his burden of clearly establishing his entitlement to a particular deduction, and the judgment of the Tax Court on this issue is affirmed.

## VI.

Finally, Long argues that the Tax Court erred by refusing to include over $200,000 in unreported legal fees in its assessment of his deficiency. He argues that a letter from his attorneys was sufficient to demonstrate the existence of the unreported legal fees. Moreover, Long argues he was tricked into abandoning his

claim by the Tax Court, and that counsel for the IRS behaved unethically by failing to disclose that the evidence offered by Long was hearsay.

In response, the IRS argues that the Tax Court correctly determined that Long's proffered evidence of additional legal fees was both inadmissible and insufficient to demonstrate his entitlement to a higher deduction.

We have repeatedly held that we will not consider issues on appeal that a party expressly abandoned at trial. *See, e.g., Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1222 n.8 (11th Cir. 2004). This Court reviews claims of judicial error in the lower courts, and if we were to regularly address questions that a lower court never had a chance to examine, it would not only waste court resources, but "also deviate from the essential nature, purpose, and competence of an appellate court." *Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1331 (11th Cir. 2004).

The taxpayer carries the burden of demonstrating with some substantiality how much of a deductible expense was actually paid or incurred. *Williams v. United States*, 245 F.2d 559, 560 (5th Cir. 1957). It is a basic requirement that the petitioner present sufficient evidence that a deductible expense was, in fact, spent or incurred for the stated purpose. *See id.*

Tax Court proceedings are conducted in accordance with the Federal Rules of Evidence applicable in a trial without a jury. *Comm'r v. Neal*, 557 F.3d 1262,

18

1272 n.9 (11th Cir. 2009) (citing 26 U.S.C. § 7453).  Hearsay is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.  Fed. R. Evid. 801(c).  Absent an exception, hearsay is not admissible.  *See* Fed. R. Evid. 802.

As an initial matter, Long's explicit abandonment of this issue at trial would typically prevent appellate review because the Tax Court would not have made a final ruling.  *See Midrash Sephardi, Inc.*, 366 F.3d at 1222 n.8; *Access Now, Inc.*, 385 F.3d at 1331.  However, Long re-raised the issue in his post-trial brief, and the Tax Court ultimately addressed the merits of Long's argument in its final decision.  Accordingly, this Court may review whether the Tax Court erred by concluding that Long did not present sufficient evidence of unaccounted legal fees.  Additionally, the record contains no evidence of unethical behavior by the Tax Court or IRS counsel, and, regardless, we need not consider issues of alleged impropriety because Long raises them for the first time on appeal.  *See Access Now, Inc.*, 385 F.3d at 1331.

Here, the Tax Court correctly concluded that Long's evidence of unaccounted legal fees was insufficient.  Long's sole piece of evidence regarding the unaccounted legal fees, a letter from his attorneys indicating that certain fees were paid, constitutes inadmissible hearsay, because the writer of the letter did not

19

testify in court or otherwise authenticate the document.[2]  *See* Fed. R. Evid. 801(c),

802.  Accordingly, having presented no other evidence, Long did not present

sufficient evidence of a deductible expense.  *See Williams*, 245 F.2d at 560.

Therefore, the judgment of the Tax Court on this issue is affirmed.

**AFFIRMED** in part, **REVERSED** in part, and remanded with instructions

for further proceedings.

---

[2] While the attorney's letter may have been admissible as a business record under Fed. R. Evid. 803(6), Long makes no such argument in his opening brief and, therefore, this Court need not consider the issue.  *See Holland v. Gee*, 677 F.3d 1047, 1066 (11th Cir. 2012).