[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-15149
_____

Agency Docket No. 029549-11

GREGORY G. BOREE,
MELANIE M. BOREE,

Petitioners–Appellants,

versus

COMMISSIONER OF THE INTERNAL REVENUE SERVICE,

Respondent–Appellee.
_____

Petition for Review of a Decision of the
United States Tax Court
_____

(September 12, 2016)

Before MARTIN and JORDAN, Circuit Judges, and COOGLER,[*] District Judge.

COOGLER, District Judge:

_____

[*] The Honorable L. Scott Coogler, United States District Judge for the Northern District of Alabama, sitting by designation.

This is an appeal from a decision of the United States Tax Court (the "Tax Court") sustaining a determination by the Commissioner of the Internal Revenue Service ("Commissioner") of deficiencies in the 2007 income tax return of Appellants Gregory and Melanie Boree ("the Borees"). The Tax Court ruled that the Borees were liable for a deficiency of $1,784,242 due to an improper characterization of income from the sale of property as a capital gain rather than as ordinary business income and imposed a 20% penalty for substantial understatement of income tax pursuant to § 6662 of the Internal Revenue Code (the "I.R.C."). After careful review of the record and briefs of the parties, and having the benefit of oral argument, we affirm the Tax Court on the issue of the Borees' tax liability but reverse the Tax Court's imposition of the statutory penalty.

## I.    BACKGROUND

In November 2002, Gregory Boree ("Mr. Boree"), a former logger, and a partner, Daniel Dukes ("Dukes"), doing business as Glen Forest, LLC ("Glen Forest"), acquired 1,892 acres of vacant real property formerly owned by International Paper in Baker County, Florida. Glen Forest bought the property for $965 per acre, for a total of $3.2 million, and borrowed much of the funds needed to purchase it. In December 2002, Glen Forest sold one ten-acre parcel of the property to an individual purchaser.

2

In January 2003, Glen Forest submitted to the Baker County Planning and Zoning Department a conceptual map of a planned residential development called West Glen Estates, which would consist of more than 100 lots, to be developed and sold in multiple consecutive phases. The following month, the county adopted the proposal and rezoned the West Glen Estates property into ten-acre lots. Glen Forest also petitioned the Baker County Board of Commissioners to exempt West Glen Estates from county platting requirements so that it could continue to sell lots without completing interior roads or submitting plans to the board. During 2003, Glen Forest sold approximately fifteen lots located around the perimeter of the West Glen Estates property.

On February 18, 2003, Mr. Boree also executed a Declaration of Covenants, Conditions, and Restrictions for West Glen Estates which, among other things, created a homeowners association to maintain roads within the subdivision. The declaration consistently referred to Glen Forest as the "developer" of West Glen Estates and provided Glen Forest the right to elect at least one member of the homeowners association's board of directors as long as the "[d]eveloper holds for sale in the ordinary course of business at least five percent (5%) of the acreage in all phases of the property." The declaration applied to the entire 1,892 acres of the Glen Forest property and did not distinguish between lots with frontage on county roads or other lots.

3

During the remainder of 2003 and through 2004, Glen Forest engaged in a series of other development activities, including obtaining county approval of the first three phases of development of West Glen Estates, applying for an Environmental Resource Permit, establishing and recording easements in collaboration with the local water and electrical utilities, and constructing Braxton Road, an unpaved road on the property, at a cost of roughly $280,000. However, Glen Forest did not install water lines, sewer lines, electrical lines, gas lines, telephone lines, cable lines, or a storm drainage system. Nor did it pave any roads, perform any grading or landscaping work, or build any structures on the property. Glen Forest did not have a sales office for West Glen Estates or hire a broker to sell lots, but it did place classified advertisements for the subdivision in local papers from time to time. During 2004, Glen Forest sold approximately twenty-six lots.

Beginning in late 2004, the Baker County Board of Commissioners adopted a series of land use restrictions that affected West Glen Estates. In October 2004, the board adopted a temporary one-year moratorium on the development of non-platted subdivisions. In November 2004, it adopted another temporary one-year moratorium on development along certain county roads, including Cowpen Road, which ran adjacent to the West Glen Estates property. In December 2004, the board adopted a third temporary one-year moratorium on the development of any

4

platted subdivisions containing dirt roads. In April 2005, it adopted a requirement that all roads within subdivisions be paved. West Glen Estates was a non-platted subdivision that contained multiple unpaved roads. Mr. Boree testified that complying with the requirement that Glen Forest pave internal roads in West Glen Estates would have cost roughly $7 million.

The Borees assert that in 2005, Glen Forest sold approximately eight lots.[1] In March 2005, Dukes sold his interest in Glen Forest to Mr. Boree. Then, Melanie Boree ("Mrs. Boree") succeeded Dukes as the second member of the LLC. Mr. Boree then requested an exception for the "whole parcel" of his property to the April 2005 ordinance requiring that roads in subdivisions be paved, but he was unsuccessful.

After his request was denied, Mr. Boree hired a land-use lawyer to pursue a different strategy. His new strategy included a higher-density development plan for West Glen Estates that would justify having to bear the costs of paving the roads imposed by the county's requirements. Mr. Boree testified that his intention was to

_____

[1] The Tax Court found that the Borees sold seventeen lots in 2005. The Borees dispute the Tax Court's findings as to how many lots they sold for the years 2005 and 2006. The discrepancy apparently stems from the Borees' practice of entering into a type of seller financing called an "Agreement to Deed," where the Borees would hold the deed as security for the purchase price and not record it until the purchaser fully paid the debt, which might occur years after the property was first sold. Thus, the Tax Court's finding that seventeen lots were sold in 2005 appears to be based on the execution of deeds related to lots that were actually sold in years prior. Because the exact number of lot sales the Borees closed in 2005 and 2006 is not dispositive with regard to our analysis, we will assume that the Borees entered into only eight new sales agreements for lots in 2005.

"up-zone" the property to make it more appealing to other developers who might be interested in purchasing the property from him. With his attorney's help, Mr. Boree prepared and submitted applications in May and June 2005 to rezone the West Glen Estates property to accommodate the denser "Planned Unit Development." This new Planned Unit Development proposal related to 982 acres of the original West Glen Estates property and included a densely zoned residential area, a 10.8-acre commercial zone, a 44-acre recreational parcel with equestrian amenities, and paved internal roads. However, the preliminary maps did not include any roads leading to the development. In April 2006, the Borees' attorney appeared on behalf of Mr. Boree before the Baker County Board of Commissioners, where he advised the Northeast Florida Regional Planning Council that Mr. Boree was planning a "large-lot subdivision with associated commercial to serve the neighborhoods" with a 40-acre "equestrian facility and bridle trails throughout the residential subdivision." The attorney, on behalf of Mr. Boree, requested that the county adopt a new land use designation of "rural commercial," never before used in Baker County, for the proposed 10.8 acres of commercial property.  The board ultimately adopted the new land use category.

In January 2006, the county adopted a requirement that developers pave certain public roads leading to their subdivisions. Mr. Boree testified that complying with the requirement that Glen Forest pave connecting county roads

6

would have cost an additional $4.4 million. The Borees assert that they did not sell any lots in 2006.[2]

Around that time, the Borees discovered that a successful Miami developer, Adrian Development ("Adrian"), was planning a large-scale development on a parcel of property adjoining the West Glen Estates property. In April 2006, Mr. Boree negotiated a real estate purchase agreement with Adrian, whereby Adrian would purchase nearly all of Mr. Boree's remaining unsold West Glen Estates property, totaling over 1,067 acres, for a price of no less than $9,000 per acre.

In June 2006, Mr. Boree's attorney again appeared before the county board on Mr. Boree's behalf at a public hearing on the rezoning action for the West Glen Estates Planned Unit Development. The attorney confirmed to the board that the West Glen Estates lots, earlier sold by Mr. Boree, all had access to ingress–egress roads. He also represented that Mr. Boree had originally wanted to sell the interior lots with access to a gravel road, but that, in response to the ordinance requiring the paving of subdivision internal roads, he had pursued the higher-density plan. Lastly, the attorney explained that Glen Forest had changed ownership, and he referred to Glen Forest as "the development entity that originally owned all this land and sold off some of it."

---

[2] The Tax Court found that Glen Forest sold four lots in 2006. Again, however, three of these appear to be deed executions in completion of earlier-executed sales agreements. The fourth "sale" in 2006 was actually a sales agreement entered into by the Borees that was never effectuated. *See* note 1, *supra.*

7

In August 2006, the county recommended approval of the West Glen Estates Planned Unit Development, on the condition that Glen Forest pave the private Braxton Road and certain other county roads that transected the property. However, in late September 2006, Glen Forest withdrew the Planned Unit Development proposal and indicated its intent to rezone the West Glen Estates property into 7.5-acre agricultural lots for a "residential subdivision."

On February 6, 2007, Adrian closed the purchase of the remaining West Glen Estates property consisting of 1,067.63 acres for $9,608,670, or roughly $9,500 per acre. The sales agreement referred to the property as "unimproved." The property sold to Adrian included tracts from approved phases I through III of the West Glen Estates subdivision, tracts that were part of the proposed Planned Unit Development, and lots in the remaining acreage. One week after the sale, Glen Forest withdrew its pending rezoning application from the county.

In all, between 2002 and 2006, Glen Forest sold approximately sixty lots comprising approximately 600 acres of its original 1,892 acres. During that time period, Glen Forest's only business activities involved sales and development related to the property. Glen Forest never made any distributions to its members. Rather, it used all proceeds to pay the carrying costs of the property.

The Borees employed the firm Austin Bovay, P.A. for tax matters and return preparation. Mr. Boree had been using Mr. Bovay, the founding CPA of the Bovay

8

firm, since 1998. Mr. Bovay was also a tax professor at the University of Florida Levin College of Law Master's in Taxation program. Ms. Messal, an employee in the Bovay office, handled the Borees' tax returns, and the Borees testified that she was extremely detail-oriented. Mrs. Boree testified that she entered all of the sales information and other data related to the maintenance of the property into QuickBooks and then provided that to Ms. Messal. In the years 2002, 2003, and 2004, Glen Forest reported on its K-1 Schedules that it had sustained ordinary (non-capital) losses on the sale of lots from the West Glen Estates property, and that Mr. Boree's share of such losses exceeded $100,000. In the years 2005, 2006, and 2007, Glen Forest reported the activities associated with Glen Forest on each Schedule C "Profit or Loss from Business" form. The Borees did not capitalize the costs associated with the West Glen Estates property, but instead characterized those costs as ordinary and necessary business expenses and took deductions for them. More specifically, the Borees deducted expenses of $293,445 in 2005; $138,168 in 2006; and $46,360 in 2007 for Glen Forest. The Borees also claimed on their Schedule C "Profit or Loss from Business" form ordinary losses of $147,196 in 2005; ordinary losses of $63,228 in 2006; and ordinary losses of $15,633 in 2007, as their business expenses exceeded their business income in each of those years. Although the Borees took deductions of $46,360 for ordinary and necessary business expenses in 2007, they nevertheless reported the gain

9

($8,578,636) from the sale to Adrian as a long-term capital gain, rather than as ordinary income, on their 2007 tax return.

On September 27, 2011, the Commissioner issued the Borees a deficiency notice pursuant to § 6212 of the I.R.C. relating to their 2007 income tax return. Specifically, the Commissioner found that the Borees' income from selling the West Glen Estates property to Adrian should have been characterized as ordinary income, rather than as a capital gain, resulting in a $1,784,242 tax deficiency. Additionally, the Commissioner imposed a penalty under § 6662(b)(2) of the I.R.C. in the amount of $356,848.40 for substantial understatement of income tax.

On December 27, 2011, the Borees filed a petition with the Tax Court asking it to redetermine their tax liability and remove the statutory penalty. During a two-day bench trial in 2013, the Borees testified that Mr. Boree purchased the West Glen Estates property intending primarily to hold it as an investment and that he sold perimeter lots only to make payments on the debt he incurred to purchase the property. While the Tax Court expressed an inclination to find the Borees' testimony credible at the conclusion of the trial, it later issued a nine-page opinion noting that the documentary evidence "convincingly contradicted" Mr. Boree's testimony and revealed that his true intent was to develop the property for sale in the ordinary course of business. The Tax Court explained that the Borees "consistently treated Glen Forest as a business" by such activities as subdividing

10

the West Glen Estates property, building a road, spending significant time and money on zoning activities, and continuing to pursue development activities after the board had adopted the moratoria on unpaved roads. The court added that the Borees consistently represented Glen Forest as a real estate business to the buyers of its property, to the county board, and on their 2005, 2006, and 2007 tax returns. It also noted that between 2002 and 2006, the Borees made frequent and substantial sales of property to customers in the ordinary course of business. Even after the Borees took full control of Glen Forest, the court noted, they "continued to engage in significant sales and development activities; reported their sales of lots [in 2005] as ordinary income; deducted, rather than capitalized, expenses relating to their real estate activities; and did not segregate the property sold to Adrian from the rest of the [West Glen Estates] property." The court thus found that the Borees' "actions from the time Glen Forest acquired the [West Glen Estates] property, through the date of the Adrian transaction, reflect their intent to develop [that] property and sell subdivided lots to customers." The Tax Court thus concluded that the Borees were not entitled to capital gains treatment on their 2007 tax return. The court further ruled that they were liable for the 20% statutory penalty because they had "not established reasonable cause for the underpayment or that the return was prepared in good faith."

The Borees timely appealed. This Court has jurisdiction to review the decision of the Tax Court under I.R.C. § 7482.

## II.    STANDARDS OF REVIEW

This Court "review[s] the Tax Court's legal conclusions *de novo*, and its factual findings for clear error." *Gustashaw v. Comm'r*, 696 F.3d 1124, 1134 (11th Cir. 2012). The determination of whether income derived from the sale of property is subject to taxation as ordinary income or as a capital gain is a "legal conclusion." *Suburban Realty Co. v. United States*, 615 F.2d 171, 180 (5th Cir. 1980).[3] However, it is a question of fact whether the taxpayer intended to hold the property primarily for sale in the ordinary course of business or for investment purposes. *Id.* at 180–81. "Whether a taxpayer acted with reasonable cause and in good faith with regard to an underpayment of tax is a question of fact that we review for clear error." *Gustashaw*, 696 F.3d at 1134.

## III.    DISCUSSION

### A.    Whether the Tax Court Correctly Held that the Borees' Gain from the 2007 Sale of 1,067 Acres of Real Property was Taxable as Ordinary Income and Not as a Capital Gain

The I.R.C. distinguishes between ordinary income and capital gains. "Income representing proceeds from the sale or exchange of a capital asset that a

---

[3] Decisions of the former Fifth Circuit issued prior to October 1, 1981, are binding precedent on this Court. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

taxpayer holds for over a year is considered a capital gain and is taxed at a favorable rate." *Long v. Comm'r*, 772 F.3d 670, 675 (11th Cir. 2014) (per curiam). The purpose behind capital gain treatment is to "ameliorate the hardship of taxation of the entire gain in one year." *Comm'r v. Gillette Motor Transp., Inc.*, 364 U.S. 130, 134, 80 S. Ct. 1497, 1500 (1960). However, "[o]ther income, or 'ordinary income,' is taxed at a higher rate." *Long*, 772 F.3d at 675. "[T]he term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business), but does not include . . . property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." *Id.* (quoting I.R.C. § 1221(a)(1)). Because capital gains treatment "is an exception from the normal tax requirements of the Internal Revenue Code, the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." *Corn Prods. Ref. Co. v. Comm'r*, 350 U.S. 46, 52, 76 S. Ct. 20, 24 (1955).

To determine whether property is a "capital asset" within the meaning of § 1221 of the I.R.C., the Fifth Circuit enumerated a list of factors:

> (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales.

13

*United States v. Winthrop*, 417 F.2d 905, 909–10 (5th Cir. 1969); *see Sanders v. United States*, 740 F.2d 886, 889 (11th Cir. 1984) (applying the *Winthrop* factors). No factor or combination of factors is controlling. *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 415 (5th Cir. 1976) (en banc). Rather, each case must be decided on its particular facts. *Id.* Still, the "frequency and substantiality" of sales is the "most important" of these factors. *Id.* at 416. This is because "the presence of frequent sales ordinarily belies the contention that property is being held 'for investment' rather than 'for sale.'" *Suburban Realty Co.*, 615 F.2d at 178.

Despite the Tax Court discussing several of the *Winthrop* factors in reaching the determination that the Borees' 2007 income was ordinary income, and not a capital gain, the Borees nonetheless raise several points on which they assert the court legally and factually erred.

1.    ***The Tax Court's consideration of the Borees' purpose in holding the property from the time it was acquired until the sale to Adrian in 2007***

The Borees first argue that their purpose in holding the West Glen Estates property changed from development to investment as a result of the Baker County land use restrictions in 2005 and 2006, which made further development so expensive as to be practically impossible, and that it was thus error for the Tax Court to have considered their purpose in holding the property at any time other than at the moment of their bulk sale to Adrian. However, in *Suburban Realty Co.*,

14

the Fifth Circuit rejected the notion that "the decisive question is the purpose for which (the property) 'primarily' was held *when sold*." 615 F.2d at 182 (emphasis added). Rather, the court reasoned, "At the very moment of sale, the property is certainly being held 'for sale.' The appropriate question certainly must be the taxpayer's primary holding purpose at some point before he decided to make the sale in dispute." *Id.* The court thus analyzed the taxpaying entity's purpose in holding the property over multiple years prior to its sale, finding that although the company originally acquired the property as an investment, it engaged in such frequent sales through a ten-year period that its primary purpose changed to "for sale" at some point during that time. *Id.* at 183–85. While the Borees would have us focus instead on this Court's statement in the subsequent case of *Sanders v. United States* that "it was the taxpayer's intent at the time of the sales that is relevant for an inquiry as to whether capital gains treatment is justified," 740 F.2d at 889, *Sanders* is not at all inconsistent with *Suburban Realty Co.* The *Sanders* court also analyzed the taxpayer's activities over multiple years in sustaining the Tax Court's decision that the taxpayer's income was ordinary income, finding that although the taxpayer's original purpose was not to establish a real estate business, by the time he earned the profits at issue in the years 1974 and 1975, he had been engaging in the business of subdividing land, making improvements, and selling lots for several years. *Id.* Thus the "sales" the *Sanders* court referred to in the

15

above-quoted statement were the taxpayer's "continuous and frequent sales of the lots over the period from 1972 to 1976." *Id*. Far from diverging from *Suburban Realty Co.*'s direction to look at the circumstances leading up to the sale, the *Sanders* court actually did the same thing, in fact citing *Suburban Realty Co.* as its source. *See id.*[4] Thus, we find no legal error in the Tax Court's consideration of the Borees' intent during the years leading up to the sale. We think that a proper analysis of a taxpayer's primary purpose in holding property should take into account a reasonable period of time prior to the sale, if for nothing else but to determine whether the taxpayer's intent changed.

In determining whether property is held for sale in the ordinary course of business within the meaning of § 1221(a)(1) of the I.R.C., considerations include (1) whether the taxpayer was engaged in a trade or business, and if so, what business; (2) whether the taxpayer was holding the property primarily for sale in that business; and (3) whether the sales contemplated by the taxpayer were 'ordinary' in the course of that business. *Suburban Realty Co.*, 615 F.2d at 178. There is no real dispute at this point that prior to the enactment of the county land use restrictions, Glen Forest held the West Glen Estates property for sale in the

---

[4] Nor could the *Sanders* panel reach a holding directly inconsistent with that of *Suburban Realty Co.* without violating our Circuit's laws. *See, e.g.*, *Cargill v. Turpin*, 120 F.3d 1366, 1386 (11th Cir. 1997) ("The law of this circuit is 'emphatic' that only the Supreme Court or this court sitting *en banc* can judicially overrule a prior panel decision."), *cert. denied*, 523 U.S. 1080, 118 S. Ct. 1529 (1998).

ordinary course of the business of developing a subdivision.[5] When Glen Forest acquired the West Glen Estates property in 2002, it began subdividing and selling lots immediately. Soon thereafter, Glen Forest began seeking approval for subdivision of the property and submitted plans for development in multiple phases. Within a few months, the Borees executed covenants and restrictions for the entire property, which identified Glen Forest as the "developer" of West Glen Estates, and provided Glen Forest a board position in the homeowners association as long as the "[d]eveloper holds for the sale in the ordinary course of business at least five percent (5%) of the acreage in all phases of the property." Mr. Boree repeatedly represented West Glen Estates to the Baker County Board of Commissioners and the Northeast Florida Regional Planning Commission as a planned residential subdivision. Through all of its efforts, including building an expensive unpaved road, obtaining various permits, creating easements, setting up a homeowners association, and submitting development plans in multiple phases to the board for approval, Glen Forest always identified itself as the "developer" of the project.

According to the Borees, however, they abandoned all intent to develop the property after the paving requirements were imposed, and they liken their case to

---

[5] Although Mr. Boree testified at trial that he always intended to hold the property for investment and that his holding purpose never changed, he now argues that his purpose changed as a result of altered circumstances.

others in which an "adverse government action" renders the taxpayer's original purpose futile. For instance, they rely on *Ridgewood Land Co. v. Commissioner*, in which the taxpayer acquired property intending to develop and sell it in the ordinary course of business. 477 F.2d 135, 136 (5th Cir. 1973) (per curiam). The State of Mississippi then authorized condemnation proceedings against the property for use in the construction of a highway. *Id.* Under threat of condemnation, the taxpayer sold the property to an adjacent landowner who was negotiating to sell the land to the state for inclusion in the highway project. *Id.* In a decision the court emphasized was based on the "the particular facts of the case," the court found that the taxpayer's purpose in holding the property had changed from ordinary course of business to investment because any development of the land would have been futile due to the impending condemnation. *Id.* That case is distinguishable, however, because an exercise of the government's eminent domain power, unlike an ordinance mandating the paving of roads, deprives a landowner of all potential uses of his property except selling the property to the government. It was appropriate for the court to conclude in *Ridgewood Land Co.* that because the property was condemned, the taxpayer lost the opportunity to develop it, and therefore had no other purpose for holding the property aside from investment. The Baker County paving requirements, however, merely placed additional costs on developers interested in pursuing certain types of development. The restrictions did

18

not foreclose all development of property in Baker County. Potential developers just had to be financially able to pave internal and connecting roads. As such, "adverse government action" cases like *Ridgewood Land Co.* are of no help to the Borees.

More importantly, even if we were to focus only on the Borees' intentions for the property after the land use restrictions were imposed in 2004 and 2005, their actions in the years 2004 through the sale in 2007 betray their true intent to continue to develop the property. When compliance with the moratoria threatened to render the original West Glen Estates development plan unprofitable, Mr. Boree did not passively hold the property in hopes that he could sell it to a buyer at an attractive price, but instead first sought to obtain exceptions to the paving requirements so that his subdivision could proceed. When that was unsuccessful, he hired a land-use attorney and applied to rezone the property for a more densely zoned residential and commercial development that would fund his costs of complying with the new county paving requirements. Indeed, Mr. Boree was successful in persuading the county board to create a new land use designation of "rural commercial," never before used in the county, for part of the Planned Unit Development. The Borees assert that the fact that their preliminary maps of the Planned Unit Development had no roads leading to it reveals that it was a mere hypothetical and that they were only trying to "up-zone" the property to make it

19

more attractive to a buyer in hopes of selling it in bulk, but they offer no explanation for the fact that they continued to pursue the Planned Unit Development strategy even after they entered into the sales agreement with Adrian in April 2006. Indeed, at the June 2006 meeting of the Baker County Board of Commissioners, Mr. Boree's attorney confirmed that the Planned Unit Development had been undertaken to justify the paving costs imposed by the county restrictions and that Glen Forest, "the development entity that originally owned all this land and sold off some of it," was the same developer who owned the remaining acreage. Such evidence of strategic and thorough involvement in pursuit of developing the property indicates that the Borees were holding the property for sale in the ordinary course of business right up until they sold it to Adrian, and not merely as an investment property. Not only that, but the Borees continued to sell, or attempt to sell, some lots to individuals after the land use restrictions were first imposed in 2004, and they deducted (instead of capitalized) expenses related to the property in 2006 and 2007. Thus, the Tax Court's factual finding that the Borees "continued to pursue development activities after the board adopted the moratoriums and requirements" was not clearly erroneous.

### 2. *The Tax Court's determination that the Borees did not segregate the property ultimately sold to Adrian*

The Borees' second argument is that the Tax Court essentially ignored Mr. Boree's testimony that he always segregated the interior acreage ultimately sold to

20

Adrian from the perimeter lots that Glen Forest regularly sold to individuals, treating the former as an investment asset and the latter as inventory merely to generate funds to pay off his debt.

A taxpayer may hold some property for sale in the ordinary course of business and some for investment, but

> the burden is on the taxpayer to establish that the parcels held primarily for investment were segregated from other properties held primarily for sale. The mere lack of development activity with respect to parts of a large property does not sufficiently separate those parts from the whole to meet the taxpayer's burden.

*Suburban Realty Co.*, 615 F.2d at 185. Whether a taxpayer segregated property for investment as opposed to inventory purposes would appear to be a question of fact, just as is the taxpayer's overall primary purpose for holding the property. *See id.* at 180–81 ("[T]he question of taxpayer's purpose or purposes for holding the property is primarily factual, as is the question of which purpose predominates.").

There was no error in the Tax Court's factual determination that the Borees "did not segregate the property sold to Adrian from the rest of the [West Glen Estates] property." The Borees argue that they never platted the large interior parcel and that the sales agreement with Adrian described it as "unimproved," but all of the maps and development plans for West Glen Estates that the Borees originally provided to the Baker County Board of Commissioners included all of the acreage, and nowhere set aside or separated out the acreage later sold to Adrian

21

from the ten-acre lots that were sold to individuals over the years. Indeed, of the acreage ultimately sold in bulk in 2007, eighty to ninety acres had been included in phases I to III of the initial West Glen Estates development plan. Early maps of the project envisioned the entire property divided into ten-acre lots, and Mr. Boree sought an exemption from the county paving requirements for the "whole parcel." Later, the plans for the Planned Unit Development encompassed the entire acreage, undermining Mr. Boree's argument that he changed his primary purpose in holding the property after the county required paving.

### 3. The Tax Court's alleged failure to consider that the Borees' gain resulted solely from market appreciation

The Borees next argue that the Tax Court erred in failing to find dispositive the fact that their $8 million profit in 2007 was due to the property appreciating in value over a substantial period of time and was not reflective of any improvements made to the property or other efforts on the part of Glen Forest in conducting ordinary business activities. However, the Fifth Circuit rejected the notion that just because an increase in property value is attributable more to market appreciation than to improvements made to the property, that the taxpayer is automatically entitled to capital gains treatment. *Suburban Realty Co.*, 615 F.2d at 186 (rejecting the notion that "all gains emanating from appreciation in value over a substantial period of time are to be treated as capital gains"). Rather, the court stated that the converse is true: "i.e., that capital gain treatment will be proper only if the gain

22

emanates from appreciation in value. Instances of gain emanating from appreciation being treated as ordinary income are not inconsistent with this proposition." *Id.* The Borees' fortuitous sale of their property to Adrian in 2007 was not entitled to capital gains tax treatment simply because the property had appreciated in value, when the sale arose from their engaging in the ordinary course of the business of developing real estate.

### 4.    The Tax Court's treatment of the Winthrop factors

The Borees' final argument is that the Tax Court "misapplied" two of the *Winthrop* factors and failed to consider others. First, they say that if the "number, extent, continuity and substantiality of sales," *Winthrop*, 417 F.2d at 910, is considered the most important factor, *see Biedenharn Realty Co.*, 526 F.2d at 416, then the Tax Court should have also considered that they sold far fewer lots after the county imposed the paving restrictions, which they say proves that they abandoned any intent to develop the property in favor of the bulk sale to Adrian. The Tax Court understandably found that the sale of approximately sixty lots comprising approximately 600 acres and over one-third of the property the Borees acquired in 2002 constituted "frequent and substantial" sales. Even if three of the four sales the Tax Court attributed to 2006 were merely the executions of deeds that the Borees held as security for the purchase price of lots sold in earlier years, the fact remains that individual purchasers continued to acquire lots from Glen

23

Forest in 2006, contrary to the Borees' contention that all business operations ceased. Further, Glen Forest engaged in no income-producing activity other than the sales of lots over the years. *See Suburban Realty Co.*, 615 F.2d at 179 n.24 ("The taxpayer's claim to capital gain treatment is likely to be weaker if he can point to no other business activities; i.e., if close to 100 percent of his income is derived from sales of real estate."). Additionally, even if the Borees did not close a single sale in 2006, they still sought to develop their property by creating and presenting the Planned Unit Development to the county board, which would increase the value of lots in future sales, and they continued to report sales of lots each year as ordinary business income on their tax returns.

Second, the Borees argue that the Tax Court misapplied the second *Winthrop* factor, "the extent of subdividing, developing, and advertising," 417 F.2d at 910, by failing to consider that Glen Forest did not advertise West Glen Estates beyond the small classified ads abandoned before the ordinances were imposed and that it never installed water, sewer, or electricity, and built only one dirt road on the property. However, the evidence discussed by the Tax Court is of development activities over a period of time. Perhaps the development activities were not as extensive as in other cases, or perhaps different inferences could be drawn from the facts. However, we discern no error related to the Tax Court's application of the second *Winthrop* factor.

24

Finally, the Borees argue that the Tax Court erred as a matter of law by not considering the remaining *Winthrop* factors, which they say tilt in their favor. However, they have not cited any authority requiring courts to address each and every factor. In fact, *Winthrop* itself states, "Despite their frequent use . . . these seven [factors] 'in and of themselves . . . have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety . . . .'" 417 F.2d at 910 (quoting *Cole v. Usry*, 294 F.2d 426, 427 (5th Cir. 1961)). We do not think that the factors are meant to be mechanically applied so as to disallow a court from viewing the evidence in its totality and drawing appropriate inferences from that evidence. For example, the Tax Court, we think appropriately, appeared to give great weight to the fact that the Borees deducted expenses related to the property from 2002 to 2007, a practice inconsistent with capital gains treatment, even though the deduction of expenses is not contemplated in the *Winthrop* factors.

As we do not find any of the Borees' arguments in support of reversal meritorious, the Tax Court's determination of their tax liability will be affirmed.

**B.    Whether the Tax Court Correctly Sustained the Imposition of a Statutory Penalty for Substantial Understatement of Income Tax**

The Borees' second request on appeal is for the reversal of the Tax Court's imposition of the substantial understatement penalty. While § 6662 of the I.R.C. imposes a 20% accuracy-related penalty on taxpayers for "[a]ny substantial

25

understatement of income tax," I.R.C. § 6662(b)(2), the penalty shall not be imposed with respect to any portion of the underpayment "if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion." I.R.C. § 6664(c)(1). It is the taxpayer's burden to establish that he acted with reasonable cause and good faith. *Calloway v. Comm'r*, 691 F.3d 1315, 1334 (11th Cir. 2012).

A court's determination of a taxpayer's reasonable cause must be "made on a case-by-case basis, taking into account all pertinent facts and circumstances." Treas. Reg. § 1.6664–4(b)(1). The most important factor in this determination is the "extent of the taxpayer's effort to assess [his] proper tax liability." *Id.* "Reliance on . . . professional advice . . . constitutes reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith." *Id.*; *see also Gustashaw*, 696 F.3d at 1139 ("A taxpayer may meet his burden by showing that he reasonably relied in good faith on the advice of an independent professional, such as a tax advisor, lawyer, or accountant, as to the transaction's tax treatment."). "The taxpayer's education and business experience are relevant to the determination of whether the taxpayer's reliance on professional advice was reasonable and done in good faith." *Gustashaw*, 696 F.3d at 1139 (citing Treas. Reg. § 1.6664–4(c)(1)). The Supreme Court recognized in *United States v. Boyle*, 469 U.S. 241, 251, 105 S. Ct. 687, 692–93 (1985), that a taxpayer

exercises "ordinary business care and prudence" when he reasonably relies on his accountant's advice on matters beyond a layperson's understanding:

> When an accountant or attorney *advises* a taxpayer on a matter of tax law, such as whether a liability exists, it is reasonable for the taxpayer to rely on that advice. Most taxpayers are not competent to discern error in the substantive advice of an accountant or attorney. To require the taxpayer to challenge the attorney, to seek a "second opinion," or to try to monitor counsel on the provisions of the Code himself would nullify the very purpose of seeking the advice of a presumed expert in the first place.[6]

To be eligible for the reasonable cause and good faith exception, the taxpayer must also show that his professional's advice was based on "all pertinent facts and circumstances and the law as it relates to those facts and circumstances." Treas. Reg. § 1.6664–4(c)(1)(i). Further, the advice relied upon must not be based on any "unreasonable factual or legal assumptions," and must not "unreasonably rely on the representations, statements, findings, or agreements of the taxpayer or any other person." *Id.* § 1.6664–4(c)(1)(ii).

The Tax Court did not elaborate on why it found that the Borees did not establish reasonable cause or that their tax return was prepared in good faith,[7] and the record does not support the court's conclusion. Mr. Boree, a former logger with

---

[6] The Supreme Court's discussion is dicta because it is unnecessary to the holding in that case, which is that a taxpayer's failure to make a timely filing of his tax return is not excused by his reliance on an agent, and such reliance is not "reasonable cause" for a late filing under § 6651(a)(1) of the I.R.C. *Id.* at 252, 105 S. Ct. at 693.

[7] The Tax Court's wording implies that one may establish reasonable cause *or* good faith to comply with § 6664(c)(1), but the statute actually requires both. I.R.C. § 6664(c)(1).

no accounting experience, had relied on the Bovay accounting firm since 1998, a firm that enjoyed a strong reputation due in part to Mr. Bovay serving as a tax professor at the University of Florida Levin College of Law. *But see* Treas. Reg. § 1.6664–4(c)(1) ("[R]eliance may not be reasonable or in good faith if the taxpayer knew, or reasonably should have known, that the advisor lacked knowledge in the relevant aspects of Federal tax law."). Mrs. Boree testified that the Borees never had any cause to question the advice of their accountant until this case. Mrs. Boree personally provided Ms. Messal in the Bovay firm, whom she described as extremely detail-oriented, with the information and records she kept relating to all of the land transactions, indicating that the Borees engaged in appropriate efforts to assess their tax liability. There is no indication in the record that the Borees withheld any information from their accountant, and the Commissioner conceded at oral argument that the Borees did not provide any false information. Although the Borees' accountant prepared the 2007 tax return claiming deductions of $46,360 for business expenses while claiming a capital gain from the same activity, we find that it was reasonable for the Borees, who were untrained in tax matters, to have relied in good faith on that decision. The Tax Court clearly erred in finding that the Borees did not establish reasonable cause and that the return was prepared in good faith.[8]

---

[8] Because we so hold, we need not address the Borees' alternative defense against the

28

## IV.    CONCLUSION

The Tax Court correctly concluded that the Borees were liable for the tax deficiency. We thus affirm the Tax Court on the issue of the Borees' tax liability for the year 2007. However, we find clear error in the Tax Court's determination that the Borees failed to establish that they acted with reasonable cause and in good faith. Accordingly, the Tax Court's assessment of the substantial understatement of income tax penalty is reversed.

**AFFIRMED IN PART AND REVERSED IN PART.**

---

imposition of the penalty, which is that they had substantial authority for their tax treatment pursuant to § 6662(d)(2)(B)(i) of the I.R.C.