# United States Tax Court

T.C. Memo. 2023-82

GLADE CREEK PARTNERS, LLC, SEQUATCHIE HOLDINGS, LLC,
TAX MATTERS PARTNER,
Petitioner

v.

COMMISSIONER OF INTERNAL REVENUE,
Respondent[1]

————

Docket No. 22272-17.            Filed June 29, 2023.

————

*Gregory P. Rhodes*, *David Mace Wooldridge*, *Michelle A. Levin*, *Sidney W. Jackson IV*, and *Ronald A. Levitt*, for petitioner.

*William Benjamin McClendon*, *Norah E. Bringer*, *Amber B. Martin*, and *Blake J. Corry*, for respondent.


## SUPPLEMENTAL MEMORANDUM OPINION

GOEKE, *Judge*: In 2012 Glade Creek Partners, LLC (Glade Creek), donated a conservation easement on undeveloped real estate that was part of a failed residential development and claimed a $17.5 million charitable contribution deduction (easement deduction). We disallowed the easement deduction in its entirety on the basis that the easement's conservation purposes were not protected in perpetuity under section 170(h)(5)[2] as that requirement is defined in Treasury

[1] This Opinion supplements our previously filed opinion *Glade Creek Partners, LLC v. Commissioner*, T.C. Memo. 2020-148, *aff'd in part, vacated in part and remanded*, No. 21-11251, 2022 WL 3582113 (11th Cir. Aug. 22, 2022).

[2] Unless otherwise indicated, statutory references are to the Internal Revenue Code, Title 26 U.S.C. (Code), in effect at all relevant times, regulation references are to the *Code of Federal Regulations*, Title 26 (Treas. Reg.), in effect at all relevant times,

**Served 06/29/23**

**[\*2]** Regulation § 1.170A-14(g)(6)(ii) (proceeds regulation), which directs the allocation of any possible future proceeds from a judicial extinguishment of the easement. *Glade Creek*, T.C. Memo. 2020-148.

We upheld the procedural and substantive validity of the proceeds regulation in *Oakbrook Land Holdings, LLC v. Commissioner*, 154 T.C. 180, 181 (2020), *aff'd*, 28 F.4th 700 (6th Cir. 2022). However, the Court of Appeals for the Eleventh Circuit held that the proceeds regulation is invalid. *See Hewitt v. Commissioner*, 21 F.4th 1336, 1339 (11th Cir. 2021), *rev'g and remanding* T.C. Memo. 2020-89. Accordingly, the Eleventh Circuit remanded this case for us to address respondent's alternative arguments for disallowing the easement deduction without reliance on the proceeds regulation. *Glade Creek Partner, LLC v. Commissioner*, 2022 WL 3582113, at \*3. The Eleventh Circuit affirmed our determination of the easement's fair market value as $8,877,771.

On remand respondent concedes that Glade Creek is entitled to an easement deduction. The sole issue before the Court is whether Glade Creek is entitled to deduct the fair market value of the easement or whether the amount of the easement deduction is limited to Glade Creek's adjusted basis in the property on which the easement was granted.[3] This issue turns on whether the property was inventory or investment property in the hands of the partner that contributed the property to Glade Creek. We hold that the easement property was inventory and the deduction is limited to Glade Creek's basis.

*Background*

We incorporate our findings in *Glade Creek* and summarize the relevant background for purposes of this Opinion. Glade Creek is a Georgia limited liability company (LLC) that elected partnership status for federal tax purposes. When its Petition was timely filed by Sequatchie Holdings, LLC (Sequatchie), Glade Creek's tax matters partner, its principal place of business was in Georgia.

In January 2006 International Land Consultants, Inc. (ILC), purchased nearly 2,000 acres of undeveloped land in Tennessee (ILC property) for over $9 million to develop into a residential vacation

---

and Rule references are to the Tax Court Rules of Practice and Procedure, in effect at all relevant times. Some dollar amounts are rounded.

[3] Respondent advanced this argument in his posttrial briefs, and petitioner had an opportunity to respond in its briefs.

[*3] community.[4] ILC planned to develop and market the property in three phases. The first phase was tract I, a 677-acre parcel with 415 lots, with subsequent phases for tracts II and III, noncontiguous parcels of 630.4 and 685.5 acres, respectively, connected by tract I, with an additional 391 lots. ILC planned to use the cashflow from phase I sales to fund development on phases II and III. All but three acres of tracts II and III are the subject of the conservation easement (easement property).

Shortly after the purchase, ILC engaged a licensed engineer to design a concept plan as a master-planned community with lots platted for all three tracts. The concept plan was completed in April 2006. By agreement dated July 24, 2006, ILC placed restrictive covenants on the ILC property. Sometime in 2006 it began to make infrastructure improvements that would support development of all three tracts. It completed soil and water absorption testing on all three tracts and obtained permits and approvals for development on all three tracts. The Tennessee Department of Environment and Conservation (TDEC) approved the concept plan for the master-planned community on the three tracts. ILC entered into a 25-year contract to supply water for development on all three tracts and constructed a hydraulic pump station and larger water mains to service the pump station with the capacity to transport water to all three tracts. It also installed electrical infrastructure that can support service of electricity to homes on all three tracts. However, it installed electrical lines, water lines, and roads only within tract I, stopping at the borders of the easement property. ILC spent approximately $6 million on the infrastructure and approval process and had "successfully completed numerous steps toward the development of all three tracts." *Glade Creek*, T.C. Memo. 2020-148, at *39. ILC planned to use the cashflow from sales on tract I to pay for additional infrastructure work on tracts II and III and record and sell the subdivided lots after the lots on tract I sold out.

Before purchasing the ILC property, ILC had engaged James Vincent, a local businessman and real estate investor and developer, to evaluate the property for its development potential as a vacation community and to assist with the permits, government approvals, and infrastructure. Mr. Vincent did not have an ownership interest in ILC and was to be compensated through a profit-sharing arrangement. Mr.

---

[4] Approximately 4 acres of the 1,997-acre ILC property were not part of the planned development. Acreage amounts are rounded.

**[*4]** Vincent also worked to obtain financing for the infrastructure construction and personally guaranteed infrastructure loans.

In March 2007 ILC recorded the lots in tract I and began sales efforts. It did not record the platted lots for tracts II and III. Mr. Vincent believed that recording the lots could increase property tax on the easement property. ILC had some initial sales success, selling approximately 30% of the tract I lots in less than two years. Sales slowed significantly by 2009 because of the 2008 economic recession and a depressed real estate market. Also, sometime in 2009 ILC stopped marketing the vacation community because of a lack of funds, and it sold nine lots in 2009. Sometime in late 2009 or early 2010 one of ILC's three owners walked away from the project, placing an increased financial burden on the remaining two ILC owners, James Tague and Rocco Toscano, and Mr. Vincent, to make payments on ILC's seller-financed mortgage for the ILC property and the infrastructure loans.

In April 2010, facing pressure from the bank that had funded the infrastructure loans, Mr. Tague, Mr. Toscano, and Mr. Vincent organized Hawks Bluff Investment Group, Inc. (Hawks Bluff), an S corporation, as equal shareholders. On April 20, 2010, ILC transferred the unsold lots of tract I and the easement property to Hawks Bluff by warranty deed in exchange for the assumption of ILC's debt. Accordingly, Mr. Vincent acquired an ownership interest in the ILC property. Mr. Vincent and Mr. Tague had invested vast sums of money in the infrastructure, and the land transfer to Hawks Bluff gave them a controlling interest in the land. The land transfer was done to help reassure the bank that financed the infrastructure loans.

Initially, the three men equally made monthly payments on the debt assumed by Hawks Bluff. Unfortunately, financial difficulties continued, and Mr. Toscano walked away and surrendered his interest in Hawks Bluff. Mr. Vincent and Mr. Tague released him from liability and assumed his share of the debt payments. But they struggled to make debt payments. In April 2011 Hawks Bluff owed approximately $5.2 million on the seller-financed mortgage. Mr. Vincent and Mr. Tague transferred real estate not connected with ILC's development as a $2.1 million payment on the mortgage, and the seller agreed to reduce the remaining unpaid mortgage by $1.3 million. After the mortgage modification, Hawks Bluff owed approximately $1.8 million on the mortgage and had total debt of approximately $3.3 million.

**[\*5]**  Financial pressures continued. Hawks Bluff sold only a couple of lots during 2010 and 2011, and no lots in 2012. Mr. Tague stopped making debt payments although he remained a shareholder of Hawks Bluff. Mr. Vincent knew that he would not be able to make the debt payments himself for an extended time. He did not have the money or desire to develop the easement property himself. He searched for a solution for the debt. He considered having the timber on the land harvested or selling part of the property to other developers but believed that both options would negatively affect residential development of tract I. After considering other options, in August 2012 he decided to pursue a syndicated conservation easement transaction to pay off part of Hawks Bluff's debt. He believed that the other options might be more lucrative but chose the conservation easement because it would protect the natural beauty of the land in a manner consistent with the original vision for a master-planned community and would protect the future development of the unsold lots on tract I, which Hawks Bluff retained and continued to market as a residential development after the easement transaction. Mr. Tague agreed to participate in the easement transaction.

Mr. Vincent sought assistance from Matthew Campbell about donating the easement. The easement transaction was designed to occur through two newly organized entities, one to hold the easement property, Glade Creek, and the second, Sequatchie, to promote the easement transaction to investors. Under the plan devised by Mr. Campbell, Hawks Bluff would contribute the easement property to Glade Creek in exchange for a 98% membership interest, and after raising money through a private placement, Sequatchie would purchase a 90% to 95% interest in Glade Creek and then, as a controlling member, would vote to grant the easement.

Glade Creek was organized and was owned 98% by Hawks Bluff and 1% each by Mr. Tague and Mr. Vincent.[5] On September 3, 2012, the members of Glade Creek entered into an operating agreement. On September 18, 2012, Hawks Bluff transferred the easement property to Glade Creek by quitclaim deed subject to a $1.8 million mortgage in exchange for a 98% membership interest. Glade Creek had a $3,861,316 carryover basis in the property. Hawks Bluff decreased the value of its inventory by $2,959,815 to account for the transfer. Glade Creek's operating agreement states that Hawks Bluff contributed property in

---

[5] The parties stipulated that the Georgia secretary of state records provide August 3, 2012, as the date of organization.

[*6] exchange for its LLC interest and defines the property as "unimproved real estate." The operating agreement does not include any terms that address the character of the real estate as inventory or investment property or the parties' reporting of the character for tax purposes. Hawks Bluff retained the lots on tract I and continued to sell them with some success. In 2015 it sold 24 lots.

On August 12, 2012, Sequatchie was organized. Evrgreen Capital Administration, LLC (Evrgreen), was its managing member. Mr. Campbell is Evrgreen's founder and became Glade Creek's manager as part of the easement transaction. Mr. Campbell engaged the professionals necessary to complete the easement transaction including tax attorney Tim Pollock. Mr. Pollock discussed the significance of having the easement property classified as inventory or dealer property for purposes of section 170(e) at a meeting that Mr. Vincent attended.

Sequatchie entered into a share purchase agreement with Hawks Bluff, Mr. Vincent, and Mr. Tague to purchase a minimum membership interest of 90% and a maximum membership interest of 95% in Glade Creek. Sequatchie had a private placement memorandum (PPM) prepared to market its membership interests to raise money for it to purchase interests in Glade Creek. The PPM described the tax consequences of a conservation easement transaction at length and included a discussion relating to whether the easement deduction would be limited to Glade Creek's adjusted basis in the easement property pursuant to section 170(e)(1)(A). It stated that Evrgreen believed that the easement property constituted a capital asset in Glade Creek's hands and therefore an easement deduction would equal the easement's fair market value. It stated that Sequatchie believed that the property had not been associated with any development or dealer activities and that to Evrgreen's knowledge neither Glade Creek nor Hawks Bluff had sold any part of the easement property or undertaken marketing or development activities. It also stated that Evrgreen did not believe that the property could be characterized as property held primarily for sale to customers in the ordinary course of a trade or business or ordinary income property in Glade Creek's hands and did not anticipate that the easement deduction would be limited to Glade Creek's adjusted basis in the easement property.

On November 29, 2012, Sequatchie acquired a 91% membership interest in Glade Creek for $3.2 million and then voted to grant the conservation easement. By deed dated December 29, 2012 (easement date), Glade Creek granted the easement. Hawks Bluff's sale of a 91%

[*7] membership interest terminated Glade Creek's taxable year under section 708(b)(1). *See* § 708(b)(1)(B) (providing for technical termination of a partnership upon a change in ownership of more than a 50% interest within a 12-month period); Treas. Reg. § 1.708-1(b)(2).

Glade Creek filed partnership returns for the short tax periods September 3 to November 29, 2012 (first short-year return), and November 30 to December 31, 2012 (second short-year return). *See* Treas. Reg. § 1.708-1(d)(2)(i) (providing that partnerships must file a tax return for the taxable year beginning on the day after the date of a technical termination). It claimed the easement deduction on the second short-year return. The returns were prepared by Habif, Arogeti, & Wynne, LLP. They reported that Glade Creek was organized on September 3, 2012, the date of its operating agreement and did not report that Glade Creek held inventory. Mr. Vincent was listed as Glade Creek's tax matters partner on the first short-year return.

Hawks Bluff's 2012 S corporation return was prepared by Sanders Associates, Inc. Hawks Bluff reported that it was a real estate dealer and reported the easement property as inventory. It decreased the value of its inventory by approximately $3 million to account for the transfer of the easement property to Glade Creek. It attached Form 4797, Sales of Business Property, to its 2012 return, on which it reported a transaction described as "Sale to Glade Creek." It reported that it acquired the asset on September 3, 2012, and sold it on November 30, 2012. It reported a gross sale price of approximately $1.4 million and an ordinary loss on the sale of $194,262.

Petitioner's expert witness Richard Norton testified that the highest and best use of the unencumbered easement property was residential development. Mr. Norton opined that the property had excellent development potential, citing the existing approvals and infrastructure from ILC's development project. He prepared a concept plan as part of his expert report for a hypothetical vacation community, which according to petitioner "largely mirrored" and "was not materially different" from ILC's concept plan. Petitioner's expert Claud Clark III determined that the fair market value of the unencumbered easement property was $17,314,049 on the basis of Mr. Norton's development concept and determined that the easement had a fair market value of $16,425,000, slightly less than the $17,504,000 easement deduction that Glade Creek claimed on its return. Respondent's expert, Ben Broome, opined that the highest and best use of the unencumbered easement property was rural residential, agricultural, and recreational use and

[*8] valued the unencumbered easement property at $1,580,000 for such use. Mr. Broome opined that a residential development was not economically feasible on the easement property. Mr. Broome valued the easement at $1,103,600.

Relying on petitioner's experts, we found that residential development on the easement property was economically feasible on the easement date and was the highest and best use of the easement property. *Glade Creek*, T.C. Memo. 2020-148, at *34. We found that on the easement date the unencumbered easement property had a fair market value of $9,354,171 and that the easement had a fair market value of $8,877,771. *Id.* at *53, *55.

*Discussion*

Section 170(a)(1) allows taxpayers to deduct charitable contributions made within the taxable year. For contributions of property other than money, the deduction is generally equal to the property's fair market value at the time of the contribution. Treas. Reg. § 1.170A-1(c)(1). However, the amount of any charitable contribution deduction must be reduced by "the amount of gain which would not have been long-term capital gain . . . if the property contributed had been sold by the taxpayer at its fair market value." § 170(e)(1)(A). If a sale of donated property would have generated ordinary income or short-term capital gain, the amount of the deduction is reduced by the amount of the ordinary income or short-term capital gain. Thus, in such a case, the deduction is limited to the taxpayer's adjusted basis in the property.

Section 724(b) provides that if a partner contributes property to a partnership that is an "inventory item" in the partner's hands immediately before the contribution, any gain or loss recognized by the partnership on the disposition of the property during the five years beginning on the date the property was contributed to the partnership is treated as ordinary income or loss. This provision was enacted to prevent conversion of a partner's ordinary income property into capital gain property by contributing it to a partnership that has a different purpose for owning the property. *See Jones v. Commissioner*, 560 F.3d 1196, 1199 (10th Cir. 2009), *aff'g* 129 T.C. 146 (2007); *Strasburg v. Commissioner*, T.C. Memo. 2000-94. If the easement property was inventory in Hawks Bluff's hands, section 724(b) would require Glade Creek to carry over Hawks Bluff's characterization of the easement property for five years after the contribution, and the easement deduction would be limited to Glade Creek's adjusted basis in the

**[\*9]** easement property under section 170(e)(1)(A). Accordingly, we must determine the character of the easement property in Hawks Bluff's hands.

Respondent argues that the easement property was inventory in Hawks Bluff's hands immediately before it contributed the property to Glade Creek. He argues that under section 724(b) the amount of the easement deduction is limited to the part of Glade Creek's adjusted basis in the easement property that is allocable to the easement determined by the ratio of the fair market value of the easement over the fair market value of the unencumbered easement property ($8,877,771/$9,354,171) multiplied by Glade Creek's adjusted basis in the easement property ($3,861,316), for a deduction of $3,664,622.[6] *See* Treas. Reg. § 1.170A-14(h)(3)(iii).

Petitioner argues that the easement property was investment property in Hawks Bluff's hands, and, accordingly, Glade Creek is entitled to an easement deduction equal to the easement's fair market value. It argues that ILC's activities are relevant to determine the character of the easement property, ILC acquired and held all three tracts as investment property, and only tract I converted to inventory. Alternatively, assuming that we find that ILC initially acquired the easement property as inventory, it argues that it converted to investment property in 2009 when ILC abandoned its intent to develop the ILC property on account of the recession and a lack of funding. It further argues that Hawks Bluff was organized to hold the easement property as investment property and held it as such.

I.     *Definition of Inventory Item*

The term "inventory item" for purposes of section 724(b) is defined in section 751(d) by reference to the definition of a capital asset in section 1221(a)(1). A capital asset is defined as "property held by the taxpayer (whether or not connected with his trade or business), but does not include . . . stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer . . . or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business." § 1221(a)(1). An inventory item is property held primarily for sale to customers in a trade or business. It is the property that is specifically excluded from the definition of a

---

[6] Respondent has not argued that petitioner is liable for an increased penalty for the part of the claimed deduction in excess of Glade Creek's adjusted basis.

**[\*10]** capital asset in section 1221(a)(1). We interpret exclusions broadly. Capital gain treatment "is an exception from the normal tax requirements of the Internal Revenue Code, [and] the definition of a capital asset must be narrowly applied and its exclusions interpreted broadly." *Boree v. Commissioner*, 837 F.3d 1093, 1100 (11th Cir. 2016) (quoting *Corn Prods. Refin. Co. v. Commissioner*, 350 U.S. 46, 52 (1955)), *aff'g in part, rev'g in part* T.C. Memo. 2014-85.

Whether income derived from the sale of property is subject to tax as ordinary income or capital gain is a legal conclusion. *Boree v. Commissioner*, 837 F.3d at 1100. Whether the taxpayer held property primarily for sale to customers in the ordinary course of its business or held it as an investment is a question of fact. *Id.*; *Pritchett v. Commissioner*, 63 T.C. 149, 162 (1974). The Eleventh Circuit has stated that the latter question involves three separate inquiries: (1) whether the taxpayer was engaged in a trade or business, and if so, what business; (2) whether the taxpayer was holding the property primarily for sale in that business; and (3) whether the sales contemplated by the taxpayer were "ordinary" in the course of that business. *Sanders v. United States*, 740 F.2d 886, 888–89 (11th Cir. 1984) (citing *Suburban Realty Co. v. United States*, 615 F.2d 171, 178 (5th Cir. 1980)).[7]

The Eleventh Circuit, to which this case is appealable, has identified the following factors as relevant to answer the three inquiries: (1) the nature and purpose of the acquisition of the property and the duration of the ownership; (2) the extent and nature of the taxpayer's efforts to sell the property; (3) the number, extent, continuity, and substantiality of the sales; (4) the extent of subdividing, developing, and advertising to increase sales; (5) the use of a business office for the sale of the property; (6) the character and degree of supervision or control exercised by the taxpayer over any representative selling the property; and (7) the time and effort the taxpayer habitually devoted to the sales. *Boree v. Commissioner*, 837 F.3d at 1100 (citing *United States v. Winthrop*, 417 F.2d 905, 909–10 (5th Cir. 1969)); *see Sanders*, 740 F.2d at 889 (applying the *Winthrop* factors).

Most of the seven factors relate to sales and marketing. Arguably, these factors support a finding that the easement property was a capital

---

[7] Fifth Circuit decisions issued before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

**[\*11]** asset because there were no lot sales on the easement property.[8] However, the factors are not a balancing test that requires us to place equal weight on each factor. "[S]pecific factors, or combinations of them are not necessarily controlling." *Biedenharn Realty Co. v. United States*, 526 F.2d 409, 415 (5th Cir. 1976) (quoting *Thompson v. Commissioner*, 322 F.2d 122, 127 (5th Cir. 1963), *aff'g in part, rev'g in part* 38 T.C. 153 (1962)). No factor or combination of factors is controlling, and each case must be decided on its particular facts. *Id.* The factors are not meant to be "mechanically applied so as to disallow a court from viewing the evidence in its totality and drawing appropriate inferences from that evidence." *Boree v. Commissioner*, 837 F.3d at 1105. "Despite their frequent use . . . these seven [factors] 'in and of themselves . . . have no independent significance, but only form part of a situation which in the individual case must be considered in its entirety . . . .'" *Id.* (quoting *Winthrop*, 417 F.2d at 910). We are not required to address each and every factor, and it may be appropriate for us to "give great weight" to facts not contemplated by the seven factors. *Id.* Under the circumstances of this case, we place significant weight on Hawks Bluff's reporting.

II.   *Hawks Bluff's Reporting as Inventory*

On its 2012 return Hawks Bluff reported that it was in business as a real estate dealer, reported the easement property as inventory, and decreased the amount of its inventory on the transfer of the easement property to Glade Creek. Statements on tax returns may generally be treated as admissions by that taxpayer. *Mendes v. Commissioner*, 121 T.C. 308, 312 (2003). Petitioner argues that Hawks Bluff's reporting was incorrect. It asserts that Hawks Bluff erroneously reported the transfer of the easement property as a sale to Glade Creek rather than a nontaxable partnership contribution so that it could claim a loss on the transfer and further argues that it mischaracterized the easement property as inventory to claim an ordinary loss.[9] It further argues that Glade Creek should not be bound by Hawks Bluff's reporting.

---

[8] ILC's sales and marketing activities with respect to tract I would likely have benefited future sales of lots on the easement property as the three tracts were one master-planned community.

[9] No gain or loss is recognized when a partner contributes property to a partnership in exchange for a partnership interest. § 721. Accordingly, it would have been incorrect for Hawks Bluff to report a loss on the contribution of the easement property to Glade Creek.

**[\*12]**  We find no error in Hawks Bluff's reporting. We do not agree with petitioner's contention that Hawks Bluff reported the contribution as a sale. The transaction at issue was reported on Form 4797, which described the transaction as "Sale to Glade Creek." However, it seems to us that it is the description of the transaction that is inaccurate and that Hawks Bluff was reporting the sale of its interest in Glade Creek, not the contribution of the easement property to Glade Creek. Hawks Bluff reported that it acquired the asset being sold on September 3, 2012, the date of Glade Creek's operating agreement and the date that Glade Creek reported that it was organized on its 2012 short-year returns. Hawks Bluff reported the date that it sold the asset incorrectly by one day. It reported the sale occurred on November 30, 2012, but it sold its membership interest on November 29, 2012. It reported the gross sale price of $1.4 million, which is the difference of $3.2 million received less the $1.8 million mortgage.

If Hawks Bluff was reporting the sale of its Glade Creek interest, as we understand it was doing, it would have been proper for it to report the transaction as resulting in ordinary income or loss assuming that the easement property is inventory. In general, the sale of a partnership interest is treated as a sale of a capital asset and results in capital gain or loss. § 741. There is an exception that requires taxpayers to report the sale of a partnership interest as resulting in ordinary income or loss if the partnership holds inventory.[10] § 751(a)(2); Treas. Reg. § 1.751-1(a)(2). In such a case, the partner is treated as selling an interest in the partnership assets. *Rawat v. Commissioner*, T.C. Memo. 2023-14, at \*8–9. Section 751 was enacted to prevent taxpayers from organizing partnerships to obtain capital gain treatment for the sale of inventory. S. Rep. No. 83-1622, at 99 (1954), *as reprinted in* 1954 U.S.C.C.A.N. 4621, 4732. Thus, assuming that the easement property was inventory, it would have been proper for Hawks Bluff to treat the sale of its Glade Creek interest as the sale of an interest in inventory, and thus Hawks Bluff would have been required to report the sale as generating ordinary income or loss.

---

[10] In general, the character of partnership property as a capital asset, a section 1231 asset, or inventory is a partnership item. Treas. Reg. § 301.6231(a)(3)-1. However, section 751 requires that "we look through the partnership to the underlying assets and deem such a sale as the sale of separate interests in each asset." *Grecian Magnesite Mining, Indus. & Shipping Co. v. Commissioner*, 149 T.C. 63, 79 (2017), *aff'd*, 926 F.3d 819 (D.C. Cir. 2019). The character of gain or loss under section 751 is an affected item. *Regents Park Partners v. Commissioner*, T.C. Memo. 1992-336.

**[\*13]** Nor do we believe that Hawks Bluff had a tax motive for mischaracterizing the easement property as inventory as petitioner alleges. Hawk Bluff reported an ordinary loss of less than $200,000 on Form 4797 and would have had a tax loss for 2012 even without claiming that tax loss. Notably, it also claimed a charitable contribution deduction of approximately $1.5 million from the easement donation. We believe that Hawks Bluff was reporting the sale of its Glade Creek interest consistent with its understanding that the easement property was inventory.

Petitioner argues that Glade Creek should not be bound by Hawks Bluff's reporting.[11] It argues that Hawks Bluff's reporting is irrelevant. But section 724(b) tells us otherwise. It is the very purpose of section 724(b) to make relevant the character of the property in Hawks Bluff's hands. Congress enacted section 724 to prevent taxpayers from attempting to recharacterize ordinary income property as a capital asset by contributing the property to a newly organized partnership before the property is sold for a gain. H.R. Rep. No. 98-432, pt. 2, at 1222 (1984), *as reprinted in* 1984 U.S.C.C.A.N. 697, 888. While Hawks Bluff's reporting may not bind Glade Creek, petitioner has not provided a satisfactory explanation with reference to the statute as to why Hawks Bluff's reporting should not be given significant weight especially in the light of the legislative purpose of section 724. It is true, as petitioner argues, that Glade Creek did not control Hawks Bluff when Hawks Bluff filed its 2012 return, but that is the fact that is irrelevant. Nothing in section 724(b) requires that the partnership have control of the contributing partner when the contributing partner files its return.

The Code gives taxpayers flexibility in how they arrange their business affairs to achieve desired tax consequences. *See Estate of Durkin v. Commissioner*, 99 T.C. 561, 571 (1992). While a taxpayer is free to organize its affairs as it chooses, once it has done so, the Commissioner may bind the taxpayer to its decision. *Bradley v. United*

---

[11] Petitioner cites only one case, *King's Court Mobile Home Park, Inc. v. Commissioner*, 98 T.C. 511 (1992), for the proposition that one taxpayer's characterization of property does not bind another taxpayer. That case does not support petitioner's argument. It involved a corporation's attempt to characterize payments to its controlling shareholder as deductible wages. The Court held that the corporation's payments were nondeductible dividends but noted that their characterization as wages or dividends had the same tax consequences to the recipient. *Id.* at 515. Thus, there was no issue relating to whether the corporation's characterization bound the recipient.

**[\*14]** *States*, 730 F.2d 718, 720 (11th Cir. 1984);[12] *see Commissioner v. Nat'l Alfalfa Dehydrating & Milling Co.*, 417 U.S. 134, 149 (1974). Glade Creek and Hawks Bluff could have set out in the operating agreement that Hawks Bluff was contributing investment property or that Hawks Bluff was to report the easement property as a capital asset. *See Wray v. Commissioner*, T.C. Memo. 1978-488 (stating that partnership agreement stated that real property was held for investment). Glade Creek knew the significance of the characterization of the easement property for federal tax purposes and was aware that the easement deduction would be limited to Hawks Bluff's adjusted basis if the property was inventory in Hawks Bluff's hands immediately before the contribution. The characterization of the easement property as inventory was discussed in the PPM, and Glade Creek's tax attorney, Mr. Pollock, discussed the issue at a meeting before the easement transaction took place. Glade Creek could have negotiated with Hawks Bluff to have it report the easement property as investment property. While a taxpayer's labels are not determinative for tax purposes, because the parties failed to attach labels in the organizational documents the only evidence in the record that objectively establishes how Hawks Bluff characterized the easement property is its 2012 return.

Petitioner has failed to present any evidence that ILC or Hawks Bluff treated the easement property as investment property in its books and records.[13] It produced Mr. Vincent as a witness but failed to elicit testimony that ILC or Hawks Bluff held the easement property for investment purposes. In the light of section 724(b) and its purpose, we place great weight on Hawks Bluff's reporting of the easement property as inventory. Statements on a return are not conclusive, however, and we examine whether the facts otherwise support a finding that the

---

[12] The Eleventh Circuit recognizes an exception to this principle that allows taxpayers to challenge the tax consequences of the chosen form only if they prove the existence of mistake, undue influence, fraud, duress, etc. *Bradley*, 730 F.2d at 720 (citing *Spector v. Commissioner*, 641 F.2d 376, 382 (5th Cir. Unit A Apr. 1981), *rev'g* 71 T.C. 1017 (1979)).

[13] Petitioner has not requested that we reopen the record. Both parties addressed the section 170(e) issue in their posttrial briefs, and petitioner had the opportunity to present evidence at trial. Accordingly, we see no need to reopen the record. Whether to reopen the record on remand is "left to the sound discretion of the trial court." *Cambridge Univ. Press v. Albert*, 906 F.3d 1290, 1302 (11th Cir. 2018) (quoting *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 551 (1983)).

[*15] easement property was a capital asset. *Suburban Realty*, 615 F.2d at 181.

III.   *Factor Test*

   A.   *Purpose for Holding Property*

The Eleventh Circuit recognizes that a taxpayer's purpose for holding property can change over time and has indicated that the purpose at the time of sale is not determinative. *Boree v. Commissioner*, 837 F.3d at 1101 ("[T]he Fifth Circuit rejected the notion that 'the decisive question is the purpose for which (the property) "primarily" was held *when* sold.'" (quoting *Suburban Realty*, 615 F.2d at 182)).[14] It has instructed that "a proper analysis of a taxpayer's primary purpose in holding property should take into account a reasonable period of time prior to the sale." *Id.*; *see Sanders*, 740 F.2d at 889 (considering years leading up to the sale and holding that the sale profit was ordinary income);[15] *Suburban Realty*, 615 F.2d at 183–84 (stating that the inquiry may consider "purpose over the entire course of his ownership . . . [and] should start at the time the property is acquired").

Petitioner argues that Hawks Bluff was organized to hold the easement property as an investment. It further argues that we should also consider ILC's purpose for holding the easement property while respondent focuses primarily on Hawks Bluff's holding purpose. Petitioner argues that ILC treated the easement property as investment property from the time of its acquisition or, alternatively, the easement property converted to investment property in 2009 when ILC abandoned the development project.

The first inquiry according to the Eleventh Circuit in *Boree* is whether Hawks Bluff was in a trade or business as a real estate dealer. Hawks Bluff reported that its business was real estate dealer on its 2012 return even though its sales had been minimal since its organization. It continued its efforts to sell lots on tract I after the easement transaction. "The taxpayer's claim to capital gain treatment is likely to be weaker if

---

[14] We have stated that generally the purpose at the time of sale is determinative, but we consider earlier events to decide the purpose at the time of sale. *Cottle v. Commissioner*, 89 T.C. 467, 487 (1987).

[15] In *Boree v. Commissioner*, 837 F.3d at 1101, the Eleventh Circuit found that consistent with *Suburban Realty* "[t]he *Sanders* court also analyzed the taxpayer's activities over multiple years" leading up to the sale.

**[\*16]** he can point to no other business activities . . . ." *Suburban Realty*, 615 F.2d at 179 n.24; *see Boree v. Commissioner*, 837 F.3d at 1105 (finding that taxpayer engaged in no other income-producing activity although it had no sales during years at issue). Petitioner argues that Hawks Bluff was organized to hold the ILC property for investment purposes but failed to address Hawks Bluff's reporting that it was a dealer. Mr. Vincent did not testify that Hawks Bluff held the easement property for investment. Nor did he contest Hawks Bluff's reporting that it was in the real estate business. He blamed the lack of sales on the economy and lack of marketing, likely because it served petitioner's argument that residential development of the easement property was economically feasible on the easement date. As explained further below, Hawks Bluff was not organized to hold the ILC property as an investment. Accordingly, we find that it was a real estate dealer.

Petitioner argues that a real estate dealer may hold real estate for investment purposes. *See Pritchett*, 63 T.C. at 163. We find that Hawks Bluff was a real estate dealer. *See Sugar Land Ranch Dev., LLC v. Commissioner*, T.C. Memo. 2018-21 (finding that tax return statements on business activity were not conclusive because they may have been inadvertently carried over from earlier returns). When a real estate dealer holds both inventory and investment property, it must segregate investment property from its inventory. *Pritchett*, 63 T.C. at 163. The Eleventh Circuit places the burden on the taxpayer to establish that it segregated the real estate purportedly held as an investment from its inventory. *Boree v. Commissioner*, 837 F.3d at 1104. The Court of Appeals has stated that "[t]he mere lack of development activity with respect to parts of a large property does not sufficiently separate those parts from the whole to meet the taxpayer's burden." *Id.* (quoting *Suburban Realty*, 615 F.2d at 185). Our caselaw considers whether the taxpayer treated the property at issue differently from its other property, made improvements or subdivided the property, held the property out for sale or advertised it, and solicited the offer that led to the sale at issue. *Pritchett*, 63 T.C. at 164–68; *Wray*, T.C. Memo. 1978-488. We have stated that holding title to real property in a different name or entity does not conclusively establish segregation but is a factor to consider. *Pritchett*, 63 T.C. at 164; *Paullus v. Commissioner*, T.C. Memo. 1996-419.

1.     *Hawks Bluff's Purpose*

On remand, petitioner argues that Hawks Bluff was organized as part of a plan to cease development, marketing, and sale activities and

[*17] to develop a plan for long-term investment of all three tracts. It states that Hawks Bluff was organized in April 2010 after Mr. Vincent, Mr. Tague, and Mr. Toscano "devise[d] a new plan [for] developing a long-term investment plan for the property" and "solidified the ILC's members' intent in holding the property as investment property."

Petitioner has not offered any evidence that Hawks Bluff was organized for the purpose of holding real estate for investment purposes. Its argument is speculative, not supported by the record, and contradicts Mr. Vincent's testimony. Its argument on remand contradicts its proposed findings of fact in its posttrial briefs where it stated:

> The property was transferred to Hawks Bluff because Mr. Vincent and Mr. Teague [sic] had invested vast sums of money to fund the utilities, roads, water and infrastructure for the property. Transferring the property to Hawks Bluff provided Mr. Teague [sic] and Mr. Vincent a controlling interest over the ILC Property. This was also done to help reassure the bank, which had significant money invested in the property through loans to Mr. Vincent.

(Citations omitted.)

Mr. Vincent testified that Hawks Bluff was organized and the ILC property was transferred to it to "help reassure the bank" that funded the infrastructure loans. We do not understand this testimony to mean that Hawks Bluff was formed to hold the property for investment purposes. By petitioner's own admission, a fundamental part of the plan was to give Mr. Vincent an ownership interest in the ILC property.

Significantly, Mr. Vincent did not testify that Hawks Bluff was organized with the intent to hold the ILC property for long-term investment. Notably, petitioner has failed to produce any evidence relating to the infrastructure loans and how ILC or Hawks Bluff represented that it held the ILC property to secure financing. We find that Hawks Bluff was organized to take over a failing real estate development with Mr. Vincent as a part owner, find a solution for the ongoing financial problems, and continue to sell the lots to customers in the ordinary course of business.

Furthermore, the evidence shows that Mr. Vincent and Mr. Tague did not want to relinquish ownership of any part of the ILC property or to do anything that might negatively affect the master-planned community for the ILC property after Hawks Bluff acquired it from ILC.

[*18] They wanted to protect their ownership and the development potential. After Hawks Bluff was organized, Mr. Vincent and Mr. Tague transferred unrelated real estate as partial payment of the unpaid mortgage. Notably, they did not surrender the easement property. The primary reason Mr. Vincent chose the easement transaction was that it solved the debt problems while protecting ILC's original vision of the vacation home community. After Hawks Bluff found the solution to its debt in the form of the easement donation, it continued its real estate business activities. Hawks Bluff did not passively hold the easement property in the hopes that it could sell it for the highest price to a third party. Under such circumstances it is difficult for us to conclude that Hawks Bluff was organized to hold the ILC property or the easement property for investment.

Petitioner produced Mr. Vincent as a witness and could have elicited testimony from him that Hawks Bluff was organized to acquire and hold the easement property as an investment but failed to do so, perhaps because it was concerned that such testimony would have adversely affected its argument that residential development was economically feasible and the highest and best use of the land. After we had agreed with petitioner that development was feasible, it conveniently changed its position on remand and argues for the first time that residential development was not feasible in 2009 to advance its argument that the easement property was investment property without having presented any evidence at trial to support the infeasibility of development in 2009.

Instead, petitioner cites Mr. Vincent's testimony that he did not want to develop the easement property alone and did not have the finances to do so after Mr. Toscano and Mr. Tague stopped making debt payments. However, neither statement means that Hawks Bluff was organized to hold the property for investment or requires a finding that its purpose for holding the property changed to investment. As *Suburban Realty*, 615 F.2d at 182, instructs, the fact that the taxpayer is not still actively engaged in the trade or business is not determinative under the statute. "The statutory language does not demand that property actually be sold while a taxpayer is still actively engaged in its trade or business for ordinary income treatment to be required. Rather, it demands that the property have been held primarily for sale in that business." *Id.* Hawks Bluff was organized as a real estate dealer and held itself out as such. It used the easement transaction to eliminate debt so that it could continue its business. It was actively engaged in that business after the easement transaction.

**[\*19]** Petitioner's argument that Hawks Bluff was organized for investment purposes is speculative and unsupported by the evidence in the record. Objective factors carry more weight than the taxpayer's subjective statements of intent. *See Guardian Indus. Corp. v. Commissioner*, 97 T.C. 308, 316 (1991), *aff'd*, 21 F.3d 427 (6th Cir. 1994) (unpublished table decision). Accordingly, we place significant weight on Hawks Bluff's reporting that it was a real estate dealer and held the easement property as inventory. Hawks Bluff's organizational documents are not in the record. There is no evidence in the record that Hawks Bluff was organized because its members decided to hold the property as investment property or that it treated the ILC property as an investment. It was organized to take over a failing real estate developer to reassure a major lender and continue the residential development business albeit unsuccessfully.

## 2. *ILC's Purpose*

Petitioner argues that ILC acquired and held the easement property as an investment. It argues the three tracts were separate assets and that ILC took specific steps to segregate the easement property from tract I to preserve the investment character of the easement property. It cites the decision not to record the platted lots and the lack of physical improvements on the easement property. To the extent that ILC's holding purpose is relevant, we find that ILC held the easement property as inventory.

ILC was in the real estate business and acquired the land because it was suitable for development. We find petitioner's argument that ILC purchased all three tracts for investment to be disingenuous considering the quick turnaround in development. ILC purchased all three tracts in one purchase in January 2006 after engaging Mr. Vincent to evaluate the property for a residential development. In its posttrial brief, petitioner stated:

> The purchase was made after an extensive and thorough investigation of its development potential. Specifically, ILC spent significant time and money to verify the property contained the topography and attributes suitable for a high-end, second-home development. The $9 Million was not spent on a whim. It was spent after an investigation by sophisticated land investors.

**[\*20]** Shortly thereafter ILC engaged a licensed engineer to design a concept plan for the development of the three tracts into one master-planned community. The concept plan was completed in April 2006. Then in July 2006 ILC placed restrictive covenants on all three tracts in accordance with the concept plan. These actions are inconsistent with petitioner's claim that ILC purchased any part of the ILC property to hold as an investment for future appreciation. *See Wray*, T.C. Memo. 1978-488 (finding that taxpayer had not made development decision at time of purchase).

By petitioner's own admission in its proposed findings of fact, ILC expanded substantial amounts of time and money to develop all three tracts. "ILC . . . expended millions of dollars . . . preparing Tracts I, II, and III for development as a master-planned community." "By March of 2007, the infrastructure (roads, underground water, electricity, utilities, soil testing, storm water plans) was in place to service all 806 lots depicted in the Concept Plan." "ILC negotiated and entered into a 25-year contract . . . that provided the ILC property with . . . enough water to cover all potential development . . . . ILC had to build a pump station [and] . . . construct a mile of water mains (pipes) to service the pump station . . . . After this process, the ILC property had the infrastructure in place to service all of the proposed 806 lots . . . ." ILC "enjoyed huge success" with tract I sales. To support its valuation, petitioner argued that "ILC invested over $6 Million into the property obtaining approvals for the property, accessing water, utilities, roads and obtaining platted approvals for the Easement Property." On the basis of petitioner's own admissions through its proposed findings of fact, we find that ILC developed the easement property and did not segregate the easement property from tract I as investment property.

Petitioner also proposed a finding of fact that "Tracts II and III were specifically held out as 'investment' property for potential future development or sale to a third-party." However, it failed to provide a reference to the record as required by Rule 151, and we have found no support for this proposed finding in the record.[16] ILC's decision to delay infrastructure improvements directly on the easement property was not based on a decision to hold it as investment property. Rather, it made a business decision to develop the ILC property in phases because of financial constraints. Mr. Vincent testified that ILC planned to develop

---

[16] Rule 151(e)(3) requires that the parties' posttrial briefs contain proposed findings of fact based on the evidence and include references to the pages of the transcript, exhibits, or other sources relied on to support the findings.

**[\*21]** the land in phases because it did not make business sense to develop all 806 lots and place them on the market at one time. Such a business plan does not establish that ILC segregated the easement property and held it for investment purposes especially in the light of the substantial amounts of time and money ILC expended to develop all three tracts.

Petitioner argues that ILC did not record the platted lots on the easement property because it intended to segregate the easement property and hold it as investment property. Such a position is not supported by the record. Mr. Vincent testified that ILC did not record the lots to avoid a property tax increase. He testified that normally developers would not record lots until roads and amenities were completed because recording can increase property tax. He stated that if lots were recorded the property would be appraised per lot so it is a "terrible mistake" to record the lots too early before the developer is ready to sell them. We do not understand Mr. Vincent's testimony to mean that ILC decided to hold the easement property for investment purposes. We relied on Mr. Vincent's explanation for not recording the platted lots in our decision that residential development was the highest and best use for the easement property. Respondent argued that the lack of recording weighed against that use. We stated that "ILC's decision not to record the platted lots in tracts II and III until it was ready to develop those tracts is irrelevant to their development potential. It did not record the lots to avoid a potential property tax increase." *Glade Creek*, T.C. Memo. 2020-148, at \*34.

There is no testimony or other evidence that ILC decided not to record the platted lots because it planned to hold the easement property for investment. Petitioner has not presented any evidence that ILC evaluated the investment potential of the easement property including the expectation of an appreciation in value and the costs of holding the property for investment purposes. Instead, petitioner stated in its posttrial brief that "[t]he property was specifically identified and investigated by ILC in 2006 for its development potential." No witness testified that ILC treated any part of the ILC property as an investment in its books and records when it acquired it or at any time thereafter. Without more, ILC's decision not to record the lots on the easement property does not establish that ILC segregated it from tract I or held it for investment purposes.

Nor has petitioner established that ILC treated any part of the ILC property as an investment in 2009 when petitioner argues ILC

**[\*22]** abandoned its intent to develop the property because of economic conditions and lack of funding. In 2009 ILC stopped marketing the ILC property and sales decreased sharply. On remand, petitioner argues that residential development was not economically feasible in 2009. However, the character of the property does not change simply because of a change in market conditions. When a company is going out of business, it is still in that business while it winds down. *See Suburban Realty*, 615 F.2d at 182. ILC was a failed real estate developer that held the entire ILC property out for sale to customers in the ordinary course of its business as a master-planned community. ILC continued to hold the ILC property in that business when it transferred its unsold inventory to Hawks Bluff although it may not have been actively engaged in that business.

B.    *Sales Activities*

The Eleventh Circuit has stated that frequency and substantiality of sales is the "most important" factor in determining the character of property. *Boree v. Commissioner*, 837 F.3d at 1100 (quoting *Biedenharn Realty*, 526 F.2d at 416). This is because sales are "highly relevant" to each of the three statutory inquiries for the characterization of property as a capital asset or inventory including whether the taxpayer is engaged in a trade or business and whether it held the property for sale in that business. *Suburban Realty*, 615 F.2d at 178. "[T]he presence of frequent sales ordinarily belies the contention that property is being held 'for investment' rather than 'for sale.'" *Id.*

As we stated above, most of the seven factors relate to sales activities. There were no lot sales on the easement property. However, the lack of sales on the easement property does not require a finding that the easement property was investment property where other facts establish otherwise. No one factor or combination thereof is controlling. *Biedenharn Realty*, 526 F.2d at 415. ILC's original plan was to develop the property in three phases and to use the cashflow from tract I sales to fund development on the easement property. In view of this plan, we place little weight on the lack of sales on the easement property. ILC did not plan to hold the easement property for investment until lots on tract I were sold out and then make a decision about whether to develop the easement property. It had a concept plan designed for a single master-planned community of the three tracts and completed significant infrastructure to enable development of all three tracts. ILC's intent was to hold the easement property as inventory for development. In the light of Hawks Bluff's reporting, ILC's development activities, and the lack of

**[*23]** credible evidence to support petitioner's argument, we find that the lack of sales on the easement property does not require a finding that ILC or Hawks Bluff segregated the easement property and held it for investment.

### C. *Development Activities*

Development activities are relevant to whether a taxpayer is in a real estate business and also to its purpose for holding land. *Suburban Realty*, 615 F.2d at 178–79. Lack of improvements can indicate that the property is not held primarily for sale. *Adam v. Commissioner*, 60 T.C. 996, 1000 (1973); *see also Brown v. Commissioner*, 143 F.2d 468 (5th Cir. 1944) (finding that taxpayer was a real estate dealer as it subdivided the land, installed utilities, built streets and storm sewers, and sold 20 to 30 lots a year); *Gates v. Commissioner*, 52 T.C. 898 (1969) (finding that property was dealer property where taxpayer subdivided lots, installed improvements, and sold home construction building materials); *Conner v. Commissioner*, T.C. Memo. 2018-6 (citing lack of development, finding that the taxpayer was not in the real estate business and was not entitled to business deductions), *aff'd*, 770 F. App'x 1016 (11th Cir. 2019).

On remand petitioner argues that the easement property was never improved or developed although it acknowledges that the easement property "economically benefited from the development" on tract I and that ILC's development activities "increased the likelihood of developing, subdividing, and selling lots" on the easement property. Petitioner relied on ILC's infrastructure and development activities to support its valuation of the easement property. In its posttrial briefs petitioner repeatedly stated that ILC made improvements that benefited all three tracts and added value to the easement property. It asserted that ILC spent $6 million on infrastructure related to the development of all three tracts. It criticized respondent's expert's valuation for failing to take into account the $6 million in improvements made for all 806 lots. It stated that "[a]ll three tracts . . . had ready-access to water, electricity, utilities, and septic tank capacity. All three tracts had paved road access. Moreover, all three tracts had obtained the required TDEC approvals, and lots were platted on all three tracts." It argued that the paved roads extending to the borders of the easement property provided the easement property with a "valuable amenity." It stated that "ILC successfully completed the steps necessary to transform the ILC Property into a fully-approved and shovel-ready 806-Lot development."

[*24] We agreed with petitioner that the highest and best use of the easement property was residential development. We relied on the fact that the easement property had platted lots, a concept plan designed by a licensed engineer, and significant infrastructure work had been completed including upgraded utility and water capacity, soil testing, approvals for septic tanks, sewage, and storm water plans. *Glade Creek*, T.C. Memo. 2020-148, at *34. We found that the easement property had been improved for development and, in this respect, agreed with petitioner. Mr. Vincent testified that ILC's development activities increased the value of the easement property, and we relied on his testimony to support our valuation. We found that Mr. Broome erred by failing to take into account "extensive development work ILC performed on the property," which contributed to the easement property's suitability for residential development. *Id.* at *32. We concluded that "[i]n the light of the improved real estate market and the significant infrastructure work and approvals previously granted, a hypothetical buyer would have reasonably purchased the property for the development of a vacation or residential community." *Id.* at *34.

We also agreed with petitioner that ILC's infrastructure and other development activities increased the fair market value of the easement property. *Id.* at *53. In our decision on the valuation, we stated:

> Mr. Vincent and ILC invested vast amounts of time and money on the development of all three tracts, spending over $6 million. Most infrastructure work took place on tract I. However, ILC had successfully completed numerous steps toward the development of all three tracts. ILC constructed a pumping station and installed upgraded pipelines to service all three tracts, upgraded electrical lines that could service residential developments on all three tracts, paved access roads leading up to tracts II and III, platted lots on the basis of a design by a licensed engineer, completed soil testing, and obtained development approvals for all three tracts. Tracts II and III clearly benefited from ILC's work even though ILC had not yet extended utilities to those tracts. Mr. Broome [respondent's valuation expert] erred by disregarding the value added to the easement property from ILC's infrastructure and approvals.

*Id.* at *39.

[*25] We held that the unencumbered easement property had a fair market value of approximately $9.3 million using a discounted cashflow method and found that value was supported by ILC's purchase price for the easement property and the value added by ILC's infrastructure improvements and development activities. *Id.* at *52; *see Boree v. Commissioner*, 837 F.3d at 1105 (finding that taxpayer's activities "increase[d] the value of lots in future sales"). We stated:

> We also consider ILC's $6 million investment in infrastructure and its work to obtain approvals which benefited all three tracts, including ensuring a water supply, upgrading water and electrical capacity, soil testing, Government approvals, and access roads leading to the easement property. Mr. Vincent credibly testified that ILC performed soil testing on tracts II and III. ILC's infrastructure and approval work clearly increased the fair market value of the easement property. . . . We find it reasonable that the unencumbered easement property would have increased by $2 and $2.5 million on the basis of appreciation and ILC's infrastructure work.

*Glade Creek*, T.C. Memo. 2020-148, at *53.

The development activities weigh against a finding that ILC segregated the easement property from tract I to hold it for investment purposes. ILC did not treat the easement property as a passive investment. Notably, Hawks Bluff did not undertake any additional development. But we place little weight on this fact because Hawks Bluff was organized to take over ILC's failing real estate business, to give Mr. Vincent an ownership interest, and to appease the bank that financed the infrastructure. Furthermore, ILC had completed the necessary infrastructure to sell the lots on tract I, making further development by Hawks Bluff with respect to those lots unnecessary.

ILC's infrastructure improvements and development activities significantly contributed to the increase in the unencumbered easement property's value over the course of ILC's and Hawks Bluff's ownership. "[C]apital gain treatment will be proper only if the gain emanates from appreciation in value." *Boree v. Commissioner*, 837 F.3d at 1104 (quoting *Suburban Realty*, 615 F.2d at 186); *see Commissioner v. Gillette Motor Transp., Inc.*, 364 U.S. 130, 134 (1960) (stating that courts should construe capital asset narrowly "in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically

**[\*26]** involving the realization of appreciation in value accrued over a substantial period of time"); *Jersey Land & Dev. Corp. v. United States*, 539 F.2d 311, 315 (3d Cir. 1976) (holding property to be dealer property where the gain resulted from substantial improvements made to the property by the taxpayer as opposed to long-term market appreciation). But even an increase in land value attributable more to market appreciation than to improvements does not automatically mean that the land is a capital asset, and profit from appreciation may be treated as ordinary income. *Boree v. Commissioner*, 837 F.3d at 1104.

Petitioner did not provide any expert testimony or other evidence as to the appreciation of the land over the six years of ILC's and Hawks Bluff's ownership from 2006 through 2012 in the absence of the infrastructure improvements. Instead, it argued the opposite. It argued that the real estate market was distressed beginning in 2008 but began to recover by December 2012.[17] *Glade Creek*, T.C. Memo. 2020-148, at \*6, \*38. It repeatedly faulted Mr. Broome's comparable sales analysis for using sales that occurred on average four years before the easement date during what petitioner called the "trough" of the recession. Petitioner has not established that the amount of the increased value of the easement property was from appreciation in the absence of the infrastructure improvements.

IV.  *Conclusion*

On the basis of the totality of the facts and circumstances, we find that ILC and Hawks Bluff did not segregate the easement property from tract I in a manner sufficient to meet petitioner's burden to show that the easement property was investment property. Petitioner has not presented any evidence to substantiate its argument that Hawks Bluff was organized to hold the easement property or to dispute Hawks Bluff's reporting that it held the property as inventory. ILC held the easement property as inventory and did not segregate it from tract I. Petitioner's position on remand that ILC did not develop the easement property is inconsistent with our findings of fact and petitioner's own posttrial brief. Petitioner relies on speculation that is unsupported by the record. We place significant weight on the only evidence in the record of how Hawks Bluff or ILC characterized the easement property, Hawks Bluff's 2012

---

[17] Mr. Clark testified that a hypothetical residential development would have a seven-year absorption period for lot sales beginning in 2012 and that unsold lots would appreciate 3% to 4% annually.

**[\*27]** return. Accordingly, Glade Creek's easement deduction is limited to the adjusted basis pursuant to sections 724(b) and 170(e).

*Decision will be entered under Rule 155.*